**Dominic PAPIANNI, James P. Kearns, Jr., Peter DiGavero, Edward Pshybshefski and Philip DiGavero, Plaintiffs,**

v.

**INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL AND ORNAMENTAL IRON WORKERS, LOCAL 11, Defendants.**

Civ. A. No. 84–1343.

United States District Court, D. New Jersey.

Dec. 10, 1985.

As Amended Dec. 19, 1985.

John A. Craner, Craner & Nelson, Mountainside, N.J., for plaintiffs.

Albert G. Kroll, Zazzali, Zazzali & Kroll, Newark, N.J., for defendants.

## OPINION

SAROKIN, District Judge.

### INTRODUCTION

The circumstances of this case do not reflect favorably upon the conduct of the union here involved. It has systematically denied rights and opportunities to its own members apparently to protect a favored group within its ranks. Furthermore, it has consistently and blithely ignored prior court rulings and seeks here to reargue many which have already been determined against it. It is difficult for the court and certainly for the plaintiffs to understand why a union would treat its own members in such a cavalier fashion. Rather than representing the interests of its members, this union appears to be acting against them and has thus denied qualified transfer applicants the opportunity to receive the rights and benefits of union membership to which they are clearly entitled.

This action is but one chapter in a series of lawsuits stretching over twenty years against various local affiliates of the International Association of Bridge, Structural and Ornamental Iron Workers, AFL–CIO, all generated by the locals' failure to accord transfer applicants the same rights and employment opportunities accorded to members of the local. The issue presented in this case is whether the deference due to

local unions in the handling of their internal affairs prevents the court from granting relief to transfer applicants who have been forced to occupy a second class status within the local union because of practices by local officials which have no basis in the union's constitution. The court concludes that the principle of deference does not extend to that extreme.

### FACTS

The facts in the record before the court, which have not been disputed in the one affidavit submitted by the defendant, are these. The five plaintiffs are all members of a local affiliate of the International Association. None of them has ever worked out of the hiring hall of the local to which he belongs, however. Rather, during the entire period of each plaintiff's association with the union, each has, with only minor exceptions, worked exclusively out of the hiring hall of the defendant, Local 11.

Pursuant to Article XXI of the International's Constitution, each plaintiff has applied to transfer into Local 11. The constitution provides that when a member wishing to transfer from one local to another properly obtains and presents a "clearance card" to the local into which he wishes to transfer, "the matter shall be referred to the Executive Committee of the local union which shall accept or reject such clearance card within the discretion of the Executive Committee". Rather than either accepting outright or rejecting the plaintiffs' transfer applications in this case, however, the Executive Committee of Local 11 informed each plaintiff that his application had been approved, but that he would be placed on an "approved transfer list". Admittance from the list would be accomplished "in the date order [that] ... transfer applications were filed, based however on the individual classification's [sic] in the trade in accordance with the needs of the industry in the Local Union's jurisdiction". Complaint, Exhibits A, C, & E (similar language in Exhibits D & E). Since the inception of the litigation, two of the plaintiffs, Peter and Philip DiGavero, have been admitted into the union, after remaining on the waiting list for five years. The remaining plaintiffs, Dominic Papainni, James Kearns and Edward Pshybyshefski, have still to be admitted after waiting five years, in the case of Papainni, and two years in the cases of Kearns and Pshybyshefski.[1]

As approved transfers on the waiting list, the plaintiffs are not granted the same rights or employment opportunities as those afforded to local members. Among the rights denied them are: (1) the right to nominate candidates for election to Union office; (2) the right to vote in elections or referendums held by the Local; (3) the right to attend membership meetings; and (4) the right to participate in deliberations or votes upon business conducted at the meetings, including contract discussions and votes on the contract, even though the plaintiffs have had to work under the conditions imposed in the contract. Approved transfers are required to pay a non-membership fee in addition to a membership fee, which they presumably pay to the locals in which they are members. They do not accrue seniority credits in the local, which are used to determine, *e.g.*, the order of layoffs on jobs.[2] They work an average of one quarter of the number of weeks per year that local members do, with correspondingly lower gross earnings. Plaintiffs allege in addition that, as approved transfers, they have been treated discriminatorily with regard to job referrals: they have not been sent out on jobs when requested by name, as is the practice with local members; they have had to wait their turn for a new referral after each job while local members have been skipped ahead; they are referred to short term jobs disproportionately often. They allege that, com-

---

**1.** According to the affidavit of James K. Boyle, 2/25/85, Business Manager of the Local, submitted by defendant, plaintiffs Kearns and Pappainni may have become disabled from working, and so may no longer desire or be eligible for membership status. That information is relevant only to the question of relief rather than to the question of liability, however.

**2.** They do receive seniority credits for pension and other benefits.

pared to local members, they are rarely appointed to be the foreman on a job, which entails a higher rate of pay. Because the union operates an exclusive hiring hall, plaintiffs essentially have no choice but to suffer this discrimination if they want to work in their trade in Local 11's jurisdiction. Defendant has not submitted any certification or affidavit to refute these claims.

On February 29, 1984, plaintiffs filed their complaint in the Superior Court of New Jersey, Chancery Division, Union County. Each plaintiff alleged that he was "entitled to be transferred into Local 11 immediately in accordance with the constitution and ritual of [the] International." Plaintiffs further alleged that "[t]he actions of Local 11 in refusing to properly process the transfer of [each plaintiff] ... is a continuation of the prior discriminatory policy of Local 11 which is to exclude, as members, those who are not in some way 'related' to existing members and to exclude those who have not been accepted through the existing apprentice program, that is, to exclude transfers." The policy was alleged to be "unreasonable, unfair and an abuse of discretion, as well as deliberately contrary to law."

Defendant duly removed the action to this court. In an opinion filed in July, 1984, this court found that it had original jurisdiction over the matter pursuant to Section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a), because the action was one seeking relief for the violation of a labor contract, the union's constitution. The court accordingly denied a motion by plaintiffs to remand.

Thereafter, defendant filed a motion for summary judgment on the ground that plaintiffs had failed to exhaust their internal union remedies. By consent of the parties, the action was stayed pending review of the matter by the International's General Executive Board.[3] The Board met on November 15, 1984, to consider the matter, and by letter dated November 21, 1984, notified each plaintiff that it had unanimously decided to deny the appeals on procedural grounds in view of all of the circumstances surrounding the appeals, including the fact that appellants did not file timely and expeditious appeals, and in view of the fact that a decision of the General Executive Board would not terminate the litigation. The G.E.B. further decided that this decision shall not be construed as an interpretation of the Constitution with respect to the merits of the transfer policies of any local union.

Defendant's Brief, Exhibit C. In view of the Board's refusal to grant the plaintiffs relief, the matter was reopened.

Subsequently, the court considered a motion by plaintiffs to amend their complaint to allege causes of action under Section 101 of the Labor Management Reporting & Disclosure Act, (LMDRA) 29 U.S.C. § 411. The court granted the motion to amend except as to claims made that the local's hiring hall practices were discriminatory because those claims were admittedly pending in another forum as a result of a complaint filed with the National Labor Relations Board (NLRB). In its Opinion, filed February 14, 1985, granting plaintiff's motion to amend, the court found that plaintiffs' Section 101 claims were not untimely under the six month statute of limitations held applicable to such claims by the Third Circuit in *Local 1397 v. United Steelworkers of America,* 748 F.2d 180 (3d Cir.1984). The court found that the Section 101 violations alleged in the proposed amendments were continuing violations and that the notifications to plaintiffs that their applications for transfer had been approved, promising them membership, albeit delayed, was not an open denial of rights triggering the running of the six month limitation period.

Before the court at this time are the cross motions of the parties for summary judgment. On the merits, plaintiffs argue that the interpretation accorded to the association's constitution by the defendant in its "approved transfer list" procedure is

---

**3.** The court finds the suggestion in defendant's brief that this stay was accomplished solely by court order, without the consent of the parties, Defendant's Brief at 2, to be most disingenuous.

patently unreasonable and therefore a violation of the constitution; that the quota system under which transfers are made constitutes an abuse of discretion by the local officials; and that the discriminatory treatment accorded to approved transfers on the waiting list violates the union member's "Bill of Rights" in Section 101. Defendant contends that the local's waiting list procedure is not a patently unreasonable interpretation of the constitution. It introduces the argument, which was not alleged as a defense in its answer either to the original complaint or to the amended complaint, that the waiting list procedure was necessary in order to comply with a 1972 Consent Decree arising out of a Title VII race discrimination suit against the local, styled *U.S. v. Plumbers Local 24, et al.*, U.S. District Court, District of New Jersey, No. 444–71. It claims that the Consent Decree bound it to achieve a percentage goal of 20 percent minority members, which goal would be defeated if the local "diluted" its membership with whites like the plaintiffs. Defendant admits, however, that "[t]he criteria for admission of the transferees included not only the Consent Decree but also the amount and nature of the work in the union's geographic area, the skills of the current members, and the rate of attrition of current members." Defendant's Brief at 13. Ignoring the court's February 14 ruling that the plaintiffs' "Bill of Rights" claims under the LMRDA were not barred by the applicable statute of limitations except in a footnote, Defendant's Brief at 25, defendant renews its argument that plaintiff's LMRDA claims are time-barred, as well as contending that their original contractual claims are time-barred.

As to plaintiffs' first cause of action, the court finds that the defendant's waiting list procedure is an obvious subterfuge to avoid the effect of a 1975 New Jersey Supreme Court decision on the practice of New Jersey Ironworker locals to exclude transfers, *Moore v. Local 483*, 66 N.J. 527, 334 A.2d 1 (1975); that the defendant's reliance on the 1972 Consent Decree to justify the practice is not only misplaced, but greatly disturbing in light of a 1978 ruling by this court definitively rejecting

defendant's interpretation of the Consent Decree; that the Local's other justification for exclusion of transfers based on the availability of work in the area is wholly improper and must be premised on a practice of discriminating against non-members in job referrals which constitutes a violation of the National Labor Relations Act; and therefore that the local's waiting list procedure is a patently unreasonable interpretation of the constitution. As to plaintiffs' second cause of action, the court finds that the approved transfer procedure has in effect created a sub-class of union members qualified for membership in the local in order to accomplish the goal of unreasonably depriving admittedly qualified applicants for membership of the rights guaranteed in Section 101; that plaintiffs' are in fact "members" of the local by virtue of their approval for transfer; and that defendant has violated their rights to participate in union governance in violation of Section 101. Finally, the court declines to reconsider its February 14 opinion that plaintiffs' LMRDA claims are timely, and finds that plaintiffs' contractual claims are timely under New Jersey's six year statute of limitations for contract claims as well.

## DISCUSSION

As noted above, plaintiffs allege two causes of action. First, they allege that the waiting list procedure violates the International's constitution. Second, they allege that the failure to accord them rights to participate in the union's decision making violated the union member's "Bill of Rights" in Section 101. The parties agree as to the first cause of action that the standard for determining whether the local's actions violate the union constitution is whether they manifest a "patently unreasonable" interpretation of the constitution. *See Plumbers Local 334 v. Plumbers Intern'l Union*, 669 F.2d 129, 131 (3d Cir. 1982). As to the second cause of action, the issue is whether or not the local is obliged to accord plaintiffs the rights they seek: that is, whether or not plaintiffs are "members" of the local within the meaning of Section 101.

## I. Background

It is impossible to understand the import and effect of the local's waiting list procedure without placing that procedure in historical context. Apparently since at least 1961, New Jersey Ironworkers locals, including Local 11, have engaged in a practice of unreasonably excluding transfer applicants from membership. *See Hughes v. Local 11,* 287 F.2d 810 (3d Cir.), *cert. denied,* 368 U.S. 29, 82 S.Ct. 51, 7 L.Ed.2d 32 (1961) (union member seeking to transfer into Local 11 had to be accorded rights guaranteed under Section 101 because he had fulfilled all of the requirements of membership, though union refused to perform ministerial acts necessary to list plaintiff as member.) For reasons that are not entirely clear in the record, it seems that local workers who aspire to become members of the union are forced to join the union as members of locals in other areas, including other states, although the applicants never travel to or work in the jurisdictions of these other locals. The applicant then obtains a clearance card and attempts to "transfer in" to the New Jersey local, though he has never worked anywhere but in the jurisdiction of that local. There is also apparently widespread illegal discrimination against the transfer members in favor of the local members in the union's exclusive hiring halls. *See N.L. R.B. v. Local 483 and Local 11,* 672 F.2d 1159, 1163 (3d Cir.1982) ("[i]n several earlier cases involving other northern New Jersey ironworker locals, all of which are parties to the same contract and consent decree and operate hiring halls identical to those at issue here, the Board found widespread discrimination by the locals in favor of their own members, highlighted by grossly disproportionate referral statistics and what the Board found to be an 'inescapable inference of deceit in maintaining the referral register' "). Plaintiffs are pursuing claims against the local before the NLRB and the courts to remedy this discrimination, although the current status of those claims is not clear in the record before the court. Perpetuation of the practice of excluding transfers from membership has been accomplished by amendments to the union's constitution and by local unions' inventiveness in creating ever new procedures to exclude transfers.

As noted in the New Jersey Supreme Court's 1975 decision regarding the then-existent practice of flat rejection of all transfer applicants in Local 11's sister local, Local 483, *Moore v. Local 483,* 66 N.J. 527, 531, 334 A.2d 1 (1975), the International's constitution has been revised twice since 1960:

> The 1960 constitution mandated acceptance by a local union of all transfer requests. The 1964 constitution provided that a local union by a majority vote could accept or reject transfer applications. The 1968 constitution, which governs plaintiffs' requests for transfer, eliminated the necessity of a vote by the entire membership of the local union and delegated the acceptance or rejection of transfers to its executive committee.

The constitutional language quoted to the court by both parties is identical to that quoted in *Moore,* and apparently has not been revised since 1968.

In 1961, in *Hughes, supra,* the Third Circuit considered Local 11's practice of simply failing to admit transfer applicants, under a constitution that mandated automatic admittance. The court found that the Local's differential treatment of transfers violated Section 101, even though the plaintiffs were not technically members of the union, because they had fulfilled all of the requirements for membership. The court reasoned that "the Act's protection is extended to those who are everything that members are, to those who are in substance members, despite the fact that the officials of the particular labor organization have not performed the ministerial acts precedent to formal admission and recognition." *Hughes,* 287 F.2d at 815.

Quite possibly in response to *Hughes* and a subsequent decision following *Hughes, Ferger v. Local 483,* 238 F.Supp. 1016 (D.N.J.1964), *aff'd* 342 F.2d 430 (3d Cir. 1965), the International amended its constitution to allow the locals to accept or reject

transfer applications, without any guidelines for the exercise of the local's discretion in making the determination. Thus, in *Philipchuk v. Ironworkers,* 87 LRRM 3169 (D.N.J.1972), *aff'd* 475 F.2d 1396 (3d Cir. 1973), this court found that the union's practice of denying rights to transfer applicants who had been *rejected* was permissible under Section 101 because, where membership was not automatic upon an application to transfer according to the constitution, the court could not interfere with the union's autonomy and discretion in determining its membership by deeming the rejected transfers to be members under Section 101.

Thereafter, in *Moore,* however, the New Jersey Supreme Court examined the union's procedure for rejection and found it wanting. The local had rejected virtually all transfer applications since passage of the amendment to the constitution allowing rejections, without stating any reason for the rejections. The court found that the executive committee's discretion to reject transfer applications was not "unlimited". *Moore,* 66 N.J. at 536, 334 A.2d 1. The executive board had to, under any reasonable interpretation of the constitution, state reasons for its rulings on the plaintiff's applications, particularly in light of the fact that "membership in the local union is a matter which critically affects a person's ability to earn a living." *Id.* at 537, 334 A.2d 1. The court noted that "[w]hile courts have traditionally refrained from interfering with the internal affairs of a union, they have not hesitated to intervene when provisions of a union constitution are repugnant to public policy and exceed limitations on the equal opportunity to work guaranteed by the state and federal constitutions ... and in requiring the acceptance of a technically competent applicant as a member where there is a restricted admissions policy and a closed shop agreement with employers in the area." *Id.* at 534, 334 A.2d 1. (citations omitted). The court remanded the case to the district court with the direction that the district court enter an order requiring the local to reconsider the

plaintiff's rejections and to state reasons for the rejection, if upheld. Thus, the New Jersey court made clear that, even if, under *Philipchuk,* those rejected for union membership were not entitled to rights in the union, transfer applicants could not be so rejected without a statement of reasons or for any arbitrary reason.

Thereafter, Local 11 adopted the approved transfer and waiting list procedure to which plaintiffs here have been subject. Under this procedure, the local does not risk having to manufacture non-arbitrary reasons for an applicant's rejection; qualified applicants are "approved", but then placed on a waiting list, which is tantamount to being rejected for the period until they are finally admitted. The question then becomes whether the new waiting list procedure satisfies the *Moore* requirement that a transfer applicant cannot be denied membership without "just cause", *Moore* at 537, 334 A.2d 1, and whether the approved transfers on the waiting list are in fact members of the local under *Hughes* because they have fulfilled the requirements of membership, as evidenced in their approval for transfer.

## II. The Constitutional Claim

■ The defendant does not claim that the waiting list procedure is literally provided for in the union's constitution, nor could it. The constitution provides only that the local should "accept or reject" transfer applications. The local contends, rather, that the waiting list procedure does not manifest a "patently unreasonable" interpretation of the union's constitution. *See Plumbers Local 334 v. Plumbers Int'l Union,* 669 F.2d at 131. It is true that great deference is due a union's interpretation of its own Constitution and that such an interpretation should not be disturbed unless it is "patently unreasonable." *Id.* Yet the two reason offered by the defendant for the use of the waiting list procedure are so illogical and impermissible, that the court cannot but conclude that the procedure involves a patently unreasonable interpretation of the union's constitution.[4]

---

4. Courts outside of this circuit have also recog- nized that an interpretation by a union of its

First, defendant contends that its quota system is required so that it may continue to meet the alleged percentage goal for minority membership purportedly set forth in the Consent Decree. The fact that defendant should choose to rely on this argument in light of the history of the litigation generating the Consent Decree is indeed odd, however; this precise issue was decided adversely to the defendant in an oral opinion rendered by the Hon. Curtis H. Meanor on September 29, 1978. *See United States v. Plumber Local 24, et al.*, No. 444–71, Transcript of Proceedings (September 29, 1978).[5]

In that case, Judge Meanor was called upon to decide whether to enjoin as violative of the Consent Decree the orders of five New Jersey state chancery court judges, presumably issued as a result of the *Moore* litigation, requiring the immediate transfer of 80 white transfer applicants into several New Jersey Ironworker locals, including Local 11. The state court orders were based on a determination that the transfer applicants had been discriminated against as non-relatives of current members, and that they were entitled as a matter of law to immediate membership in the locals in question. *Id.* at 35–36. Judge Meanor specifically noted that the decision before him was not whether he had the power to restrain the state court's orders, which he assumed that he had. *Id.* at 36, 11. 5–7. Rather, the critical question was whether the state court's orders to transfer the applicants into the locals would "impair or affect or frustrate the Federal Court order." *Id.* at 41, 11. 19–20. Judge Meanor concluded that they would not.

The judge first noted that, contrary to the defendant's contention before the court here, *see* Defendant's Brief at 3, the Consent Decree contained no percentage quota for minority membership. *Id.* at 40. Rather, the Decree merely set a goal for the admission of 375 new minority members

through the local's apprenticeship program. Moreover, the only provision specifically addressing transfer applicants, Paragraph 33B of the decree, as amended by a 1973 stipulation of the parties, merely provided that transfer applications would be accepted or rejected according to the "rules and regulations of the defendant locals and the International governing such transfers," so long as the procedures employed "did not have the effect of discriminating against or excluding any such applicant on the basis of his race or color, or of perpetuating the effects of any such past exclusion ..." Thus, the judge found that "as a matter of plain English", the Consent Decree did not preclude the transfer of applicants ordered by the state court.

Judge Meanor went on to find that enforcement of the state court orders would not frustrate the intent of the Consent Decree. He noted that admission of the transfer applicants would not affect measures taken under the decree to admit the targeted 375 minority members through the apprenticeship program. And, he noted that admission of the transfer applicants should not affect job assignments for minorities because the locals were theoretically bound not to discriminate against non-members in job assignments in any event. Finally, he dismissed any argument that addition of the transfer applicants would dilute the political power of the minorities in the locals, observing that

> what is really sought here in my judgment is to use the fact of past racial discrimination on the part of these defendants as a reason for the perpetuation of their historical discrimination against transferees ... if experience shows that minority rights are somehow frustrated or impaired by the presence of the transferees in these locals, then the thing to do is not to discriminate against the transferees, but to adjust the consent

own constitution is due no deference when it manifests bad faith on the part of the union. *Monzillo v. Biller*, 735 F.2d 1456, 1458, (D.C.Cir. 1984). On the facts that follow, the court could easily make a finding of bad faith as an alternative ground for its holding on this claim.

5. A transcript of this oral opinion was not supplied by the parties, but is contained in the records of this court, of which the court takes judicial notice.

order so that that discrimination against blacks can be eliminated.

*Id.* at 43–44.

The court is in complete agreement with the determination of Judge Meanor made seven years ago. It is obvious that the intent of the Consent Decree is to require the union to take affirmative steps to *increase* the number of its minority members, not to decrease the number of its members overall. Indeed, the sections of the Consent Decree that have been supplied to the court contain detailed requirements for recruiting minority members and otherwise encouraging minority applicants, but contain no provision requiring the local to limit its membership. Moreover, even if the defendant in good faith believed that the Consent Decree required maintenance of a certain percentage of minority members, Judge Meanor's ruling to the contrary notwithstanding, it is apparent to the court that compliance with the Consent Decree was not the union's chief motivation for adopting the waiting list procedure; not one of the waiting list notices to plaintiffs so much as mentioned the Consent Decree. Rather it appears to the court that, as in 1978, "what is really sought here ... is to use the fact of past racial discrimination on the part of these defendants as a reason for the perpetuation of their historical discrimination against transferees." *Id.* Defendant's attempt to twist the Consent Decree to justify this self-protectionism is indeed offensive to this court.

Even were the court not in such firm agreement with Judge Meanor, defendant is certainly bound by Judge Meanor's construction of the Consent Decree issued in the context of the *Plumber's Local* litigation in any event.[6] Given the binding construction of the Consent Decree lent to it by Judge Meanor, the court cannot but conclude that any interpretation of the union's constitution resting on an alternative construction of the Decree is truly "patently unreasonable."

Defendant's second rationale for the use of the waiting list procedure is equally unreasonable. Local 11 operates an exclusive hiring hall in its jurisdiction. Under these circumstances, it is illegal and an unfair labor practice within the meaning of the National Labor Relations Act for the local to discriminate against non-members in job referrals. 29 U.S.C. § 158(b)(1)(A), (b)(2); *N.L.R.B. v. Local 483 and Local 11,* 672 F.2d 1159. Yet the local contends that it is privileged to allocate membership to transfer applicants based on "the amount and nature of the work in the union's geographic area, the skills of the current members, and the rate of attrition of current members," Defendant's Brief at 13 and Exhibit G (Answer to Interrogatories 11(b) and (c)), and that it may limit its membership to a number bearing "some rational relationship to the number of jobs available." Defendants' Brief at 16. Given that it is illegal for the union to discriminate against non-members in job referrals, the court is utterly baffled by this explanation for the union's waiting list procedure. Obviously, if the local is truly fair in referring jobs as between members and non-members of the local, there is no reason why the availability of work should be a barrier to membership. The only possible rationale for limiting the number of members based on the availability of work that the court can conceive of is an intention of the part of the union to discriminate illegally against non-members and to give preference to members in job referrals. A practice which so assumes as its justification a violation of the NLRA could hardly be a "reasonable" interpretation of the International's constitution.

Defendant's sole support for the argument that their interpretation is not "patently unreasonable" is a decision by the Seventh Circuit, *Gavin v. Local 1,* 553 F.2d 28 (7th Cir.1977), which, although factually similar, is legally inapposite. *Gavin* was a suit by members of the International Ironworkers who had applied for admission to

---

6. Judge Meanor's ruling was appealed, but that appeal was eventually dismissed for want of prosecution. An application for a stay of Judge Meanor's decision pending appeal, filed shortly after the appeal, was denied by an individual judge and a panel of the Court of Appeals.

an Ironworkers local in the Chicago area. Rather than accepting or rejecting the applicants outright, the local held the applications in abeyance, without acting on them for an extended period of time, ostensibly because acceptance of the applicants would hinder the local's compliance with a court decree arising out of a race discrimination suit against the union.[7] The plaintiffs argued that, for all intents and purposes, they were members of the local and, as such, were entitled to the rights outlined in Section 101 of the LMRDA.

The Seventh Circuit disagreed. The court noted that acceptance of the transfer applicants under the International Constitution in effect in 1977 was not simply a ministerial act, as it had been at the time of the Third Circuit's decision in *Hughes v. Local 11*, 287 F.2d 810 (3d Cir.1961); rather, the constitution allowed the local to accept or reject would-be transferees. Thus, applicants could not be said to have fulfilled the requirements of membership simply by submitting their applications for transfer, as they had in *Hughes*. They were accordingly not automatically entitled to be afforded the rights of members guaranteed in section 101, as were the plaintiffs in *Hughes*. The court thus declined to grant the plaintiffs the relief sought.

The *Gavin* decision dealt only with claims asserted under section 101 of the LMRDA, however. It did not purport to interpret the union's constitution or to suggest that the constitution contemplated the practice of holding applications in abeyance. Contrary to defendant's claim, it does not indicate that Local 11 would have been "within its rights" under the union constitution in holding the plaintiffs' transfer application in abeyance. Defendant's Brief at 16. *Gavin* is simply inapposite, therefore, to the issue of whether the waiting list procedure was a reasonable interpretation of the union's constitution.

Moreover, it appears to the court that defendants have rather disingenuously seized upon *Gavin* as support for their position while studiously ignoring binding

precedent closer to home, namely, *Moore* and Judge Meanor's ruling in *Plumber's Local*. *Moore* made clear that the Ironworkers could not reject transfer applicants without "just cause"; Judge Meanor in *Plumber's Local* made clear that the consent decree entered in that case did not provide any such "cause". After this decision, the local, unable simply to reject applicants without a statement of reasons, as it had been doing, apparently fashioned a new means of accomplishing the same protectionist goal: that is, by creating the approved transfer list. In fact, the timing of the first implementation of the waiting list procedure immediately after Judge Meanor's refusal to stay the state court orders requiring transfer of deserving applicants, *see* Boyle Aff. ¶ 6–8, indicates that resort to the waiting list procedure was a direct response to the ruling of Judge Meanor and the state court. *Gavin* does not make this sort of unreasonable behavior reasonable.

In sum, the court finds that the rationales offered by the defendant for its interpretation of the union constitution are either foreclosed by *Plumber's Local* or presumptively motivated by the illegal purpose of discriminating against transfer applicants in job referrals. The court cannot accept that these pretextual or illegal goals represent a reasonable interpretation of the union constitution. Accordingly, the court concludes that the defendant's use of the approved transfer list is a violation of the International constitution.

### III. *The Section 101 Claims*

 Aside from their claims based on the International constitution, plaintiffs allege that they have been unlawfully denied the rights owing them under the union member's "Bill of Rights", Section 101 of the LMRDA, 29 U.S.C. § 411 *et seq.* Section 101 "is designed to guarantee every union member equal rights to vote and otherwise participate in union elections, freedom from unreasonable restrictions on

---

7. The plaintiffs argued that the local's inaction on their applications was in fact designed to

defeat, rather than to further, the goals of the consent decree.

speech and assembly, and protection from improper discipline." *Local No. 82 v. Crowley*, 467 U.S. 526, 104 S.Ct. 2557, 2564, 81 L.Ed.2d 457 (1984). Under the terms of the Act, this guarantee extends only to union "members". *Mackenzie v. Local 624*, 472 F.Supp. 1025, 1030 (N.D. Miss.1979). Yet membership is not limited only to those whom the union has officially recognized as members. *Brennan v. Local 357*, 709 F.2d 611, 614 (9th Cir.1983); *Alvey v. General Electric Co.*, 622 F.2d 1279, 1284 (7th Cir.1980). Rather, a "member" includes "any person who has fulfilled the requirements for membership in such organization ..." 29 U.S.C. § 402(*o*). Thus, the Act provides membership to "those who are members in substance despite the fact that union officials have not performed the ministerial acts necessary to give formal recognition to a person's status as a member." *Brennan v. Local 357*, 709 F.2d at 614, citing *Hughes v. Local 11*, 287 F.2d at 815. In the Third Circuit's decision in *Hughes*, this meant that Local 11, the defendant in this case, could not refuse membership rights to a transfer applicant who had fulfilled all of the requisites for membership in the Local. Despite changes in the union constitution since *Hughes*, that decision is still controlling here.

As noted previously, at the time of the *Hughes* decision, the Ironworker's International constitution did not allow for any discretion as to whether an applicant for transfer could be admitted: the constitution mandated admission. The only prerequisite for transfer membership at that time was the presentation of a "transfer card". *Hughes v. Local 11*, 287 F.2d at 812. Subsequent to *Hughes*, the constitution was changed so that the union's Executive Committee may now decide to reject an applicant for transfer, provided that, after *Moore*, it has a good, non-arbitrary reason for doing so. This change in the union's constitution in no way alters the fundamental principle of *Hughes*, however, that an applicant who has fulfilled all substantive requirements for membership *is* a member and is due the rights of membership under section 101. The union's failure to perform some ministerial act acknowledging the

membership of one who has fulfilled membership requirements does not give the union license to refuse to accord the applicant the rights he is due.

■ In this case, plaintiffs' applications for transfer were not rejected, they were expressly approved: each plaintiff received a letter from the union indicating that the Local's Executive Committee "has approved your application for transfer of membership." Complaint, Exhibits A–E. Moreover, they were informed that "[n]o further action will be required on your part to gain admission." *Id.* According to the defendant's own Executive Committee, therefore, the plaintiffs had fulfilled all of the requirements for membership. The only step standing in the way of the plaintiffs' admission was removal from the approved transfer list to the active membership list, just as in *Hughes* the only step was formal recognition of the plaintiff's application. This is in direct contrast to the circumstances existing in *Philipchuk* and *Gavin*, where no finding of qualification for membership by the union had been made. When an applicant has been determined by the union to have fulfilled the requirements for membership and the only barrier to the applicant's admission is formal recognition by the union, *Hughes* mandates that the applicant be afforded the rights of a union member as provided in section 101 of the LMRDA. The plaintiffs are thus entitled to relief on this count of the amended complaint as well.

## IV. *Statute of Limitations*

■ Notwithstanding the merits of plaintiffs' claims, and despite the court's previous ruling that plaintiffs' LMRDA claims were not time-barred, defendant again contends that plaintiffs are barred from obtaining relief on their LMRDA claims by virtue of an alleged untimeliness in the filing of their complaint. Defendant now extends this argument to plaintiffs' contract claims as well. Once again, the court is unpersuaded. The court finds that plaintiffs' claims under the union constitution are subject to New Jersey's six year

statute of limitations for contract actions, under which they are clearly timely. Moreover, even if plaintiffs' contract claims were subject to the shorter six month statute of limitations borrowed from section 10(b) of the NLRA, as defendant urges, the plaintiffs' claims are timely because the letters of notification from the local to the plaintiffs, which defendants claim triggered the limitation period, were not "definitive adverse actions" sufficient to start the running of the limitation period. *See Local 1075 v. Rubber Workers*, 716 F.2d 182, 187 (3d Cir.1983). The court declines to reconsider its previous ruling that plaintiffs' LMRA claims are timely under the six month statute of limitations under a theory that the actions complained of constituted a repeated violation triggering the running of the limitation period anew with each violation.

### A. *Selection 301 Claims*

#### (1) *Applicable Limitation Period*

Nearly twenty years ago, the Supreme Court ruled that suits on labor contracts under section 301 were subject to the state limitation period for the most closely analogous state cause of action. *International Union, United Automobile, Aerospace & Agricultural Implement Workers of America, AFL–CIO v. Hoosier Cardinal Corp*, 383 U.S. 696, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966). In *Hoosier Cardinal* the Court noted that suits on labor contracts within the federal courts' jurisdiction under section 301 are generally to be governed by "federal law, which the court must fashion from the policy of our national labor laws." *Id.* at 701, 86 S.Ct. at 1111, quoting *Textile Workers v. Lincon Mills*, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). Given that section 301 does not specify any limitation period, however, the Court declined to fabricate one. Instead, it ruled that federal courts entertaining section 301 suits should simply borrow the most analogous state limitation period. *Id.*, 383 U.S. at 703–04, 86 S.Ct. at 1112. While recognizing the lack of uniformity this rule of thumb would cause, the Court reasoned that the relatively small need for uniformity in most section 301 suits was not a sufficient justification "for the drastic sort of judicial legislation that is urged upon us." *Id.* at 703, 86 S.Ct. at 1112.

That holding remained intact until 1983, when it was modified somewhat in *DelCostello v. Teamsters*, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983). *DelCostello* involved a "hybrid" action under section 301 by an employee against his employer for breach of a collective bargaining agreement, and against his union for breach of its duty of fair representation, a type of action first recognized in *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967) and *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976). The Court explicitly noted that an employee's cause of action for breach of the duty of fair representation against a union "is implied under the scheme of the National Labor Relations Act," *id.*, 462 U.S. at 164, 103 S.Ct. at 2290, and, as such, bears a marked "family resemblance" to a claim based on an unfair labor practice. *Id.* at 170, 103 S.Ct. at 2293. Because hybrid employee suits implicate many considerations relevant to the choice of a limitations period in common with those raised by unfair labor practice charges under the NLRA, including "the proper balance between the national interests in stable bargaining relationships and finality of private settlements, and an employee's interest in setting aside what he views as an unjust settlement under the collective bargaining agreement," *id.* at 171, 103 S.Ct. at 2294, the court concluded that section 10(b)'s six month limitation period was more appropriate to such suits than any alternative state limitations period. The Court cautioned, however, that its holding "should not be taken as a departure from prior practice in borrowing limitations periods for federal causes of action, in labor law or elsewhere." *Id.* at 171, 103 S.Ct. at 2294. Rather, federal limitation periods should only be preferred over otherwise available state limitations periods "when a rule from elsewhere in federal law clearly provides a closer analogy than available state statutes, and when the federal policies at stake and the practicalities of litigation make

that rule a ... more appropriate vehicle for interstitial lawmaking." *Id.* at 172, 103 S.Ct. at 2294.

The Third Circuit subsequently expanded the new policy of borrowing the federal NLRA limitation period in labor suits by applying it to an action under the union member's "Bill of Rights", Section 101 and 102 of the LMRDA, 29 U.S.C. §§ 411–412.[8] The court found that section 102 claims implicated the same concerns underlying the choice of limitations periods as did unfair practice charges, including the interest in "rapid resolution of internal union disputes." *Id.* at 184. The court also reasoned that the "allegedly unlawful activity in a section 102 action is rarely latent," so that imposition of a six month limitation would not be inherently unfair. *Id.*

Since its decision in *Local 1397*, the Court of Appeals for this Circuit has applied the section 10(b) limitation period in a hybrid duty of fair representation/breach of contract action brought to enforce, rather than to vacate, an arbitration award, in contrast to the circumstances in *Mitchel* and *DelCostello*. *See Taylor v. Ford Motor Co.*, 761 F.2d 931 (3d Cir.1985). The court construed *DelCostello* "as mandating application of the six month limitation period to all section 301 actions that are predicated upon a union's breach of its duty of fair representation, and implicate no countervailing federal policy." *Id.* at 932. It expressly distinguished "straight, non-hybrid section 301 actions, to which, the Supreme Court has indicated, the rule of *Hoosier Cardinal* still applies." *Id.* at 933 n. 2, citing *DelCostello*, 462 U.S. at 151, 103 S.Ct. at 2281. The court has also ruled that a suit by a union against an employer to compel arbitration is governed by the six month limitation period of section 10(b). *Federation of Westinghouse Independent Salaried Unions v. Westinghouse Electric Corp.*, 736 F.2d 896 (3d Cir.1984).

Following the Third Circuit's ruling in *Local 1397*, in the context of plaintiff's motion to amend their complaint, this court held that plaintiffs' section 101 claims were subject to the six month limitations period of section 10(b). The defendant now urges the court to find that plaintiffs' contract claims, founded upon the union constitution, are subject to the six month limitation period as well. Yet, as outlined below, defendant's argument contradicts the logic of *DelCostello*, *Taylor*, and *Local 1397*, and would effectively overrule *Hoosier Cardinal* if adopted.

As noted, the Court in *DelCostello* reaffirmed the rule that "resort to state law remains the norm for borrowing of limitation periods," and cited *Hoosier Cardinal* approvingly. 462 U.S. at 171, 103 S.Ct. at 2294. The court purported only to be stating a rule for actions in which "there is not ... an obvious state-law choice for application ..." *Id.* at 172, 103 S.Ct. at 2294. In such cases, "where a federal law clearly provides a closer analogy than available state statutes," the federal limitation should be borrowed, particularly "when the federal policies at stake and the practicalities of litigation make that rule a significantly more appropriate vehicle for interstitial lawmaking ..." *Id.* The threshold question under *DelCostello* is therefore whether there exists an obviously analogous state law limitation period for any claim arising in a labor context.

For claims arising solely out of the rights and obligations created by federal labor statutes, it is naturally difficult to find a limitation corresponding to a comparable state law claim. Breaches of the duty of fair representation or breaches of the union member's "Bill of Rights" will generally have no very close state law analogue. Applicable limitation periods will vary widely from state to state, depending on how the analogy to federally-created causes of action is drawn. In such cases, a federal limitation period, such as the six month period set in section 10(b) of the NLRA, will make for a closer fit. Application of a state limitation period will result

---

**8.** Section 101 outlines the rights guaranteed to union members. Section 102 provides a right of action to enforce those rights.

only in a straining to find the most analogous period, and uncertainty and unpredictability for litigants.[9]

■ In an action to enforce a labor contract, however, a closely analogous state statute will always be available. Claims sounding in contract are as old as common law jurisprudence itself. The states have a well developed and consistent body of contract law, reflecting the cumulative wisdom of jurists over the years. Indeed, in ruling that section 301 does not pre-empt state court jurisdiction over disputes based on labor contracts, the Supreme Court recognized that Congress intended the courts to draw upon the expertise of the state courts and this body of state contract law in the resolution of labor contract disputes: "The clear implication of the entire record of the congressional debates in both 1946 and 1947 [in connection with passage of Labor Management Relations Act] is that the purpose of conferring jurisdiction upon the federal district courts was not to displace, but to supplement, the thoroughly considered jurisdiction of the courts of the various states over contracts made by labor organizations." *Charles Dowd Box Co. v. Courtney*, 368 U.S. 502, 511, 82 S.Ct. 519, 525, 7 L.Ed.2d 483 (1961). Notably, although Congress chose to make certain causes of action based on federally created rights subject to the exclusive jurisdiction of the National Labor Relations Board in the interest of promoting uniformity of decisional law, it

> expressly rejected that policy with respect to violations of collective bargaining agreements by rejecting the proposal that such violations be made unfair labor practices. Instead, Congress deliberately chose to leave the enforcement of collective bargaining agreements 'to the usual process of law.'

*Id.* at 513, 82 S.Ct. at 526, quoting H.R. Conf.Rep. No. 510, 80th Cong., 1st Sess., p. 42, U.S.Code Cong. Service 1947, p. 1147. Congress thus clearly contemplated that courts would look to the consistent body of state contract law, including procedural law, in fashioning rules to govern labor contract disputes. The direction in *DelCostello* to look to state statutes of limitation where they are closely analogous is simply a restatement of that policy.

■ Unlike either of those two scenarios, as noted, *DelCostello* itself involved the rather unique circumstance of a "hybrid" action of the sort recognized in *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967) and *Hines v. Anchor Motor Freight*, 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976). In such a suit, involving a breach of contract by an employer and a breach of the duty of fair representation by a union, the plaintiff's cause of action in contract against the employer necessarily depends upon a showing that the union breached its duty of fair representation to the plaintiff, *Vaca*, 386 U.S. at 186, 87 S.Ct. at 914; *Hines*, 424 U.S. at 572, 96 S.Ct. at 1060. The employee's contract claim is "inextricably interdependent" with the breach of duty claim. *DelCostello* 462 U.S. at 164–65, 103 S.Ct. at 2291.

■ In the circumstances of a hybrid suit, the application of a six month limitation period made sense. The union's duty of fair representation is an obligation implied under the scheme of the NLRA. *DelCostello* 462 U.S. at 164 and n. 14, 103 S.Ct. at 2290 and n. 14. As such, it is logically subject to the six month limitation applicable to claims under the NLRA. Given that the employee has no cause of action in contract against the employer absent a showing that the union has breached its duty, it follows that the same six month limitation period should be applied to the suit as a whole. *See United Parcel Service Inc. v. Mitchell*, 451 U.S. 56 at 67, 101 S.Ct. 1559 at 1566, 67 L.Ed.2d 732 (1981) (Stewart J., concurring).

■ Nothing in the logic or language of *DelCostello* indicates that the six month limitation period should apply to a

9. For example, the appellants in *Local 1397* argued that Pennsylvania's statute of limitation applicable either to tort actions for interference with business relations, or to actions to enforce civil rights, should be applied to their claim for breach of the union members' "Bill of Rights".

contract action under section 301 when the contract claim is not, as in a *Vaca-Hines* suit, absolutely predicated on the existence of an implied claim under the NLRA, or some other federally created right. Rather, "straight, non-hybrid, section 301 actions" remain subject to the rule in *Hoosier Cardinal*. *Taylor v. Ford Motor Co.*, 761 F.2d at 933 n. 2. The rule emerging from *DelCostello* and its progeny in this circuit is therefore that causes of action created by federal labor statutes, such as a breach of duty claim implied under the NLRA, or a claim under the union member's "Bill of Rights", are governed by the six month limitation period borrowed from the NLRA, as are "hybrid" suits which necessarily require the proof of a statutory claim for recovery. Claims arising solely as a result of a contract between labor organizations, however, are subject to the usual state contract limitation period, borrowed and incorporated as federal law, as long as the plaintiff's contract claim does not necessarily entail proof of a federal statutory violation as a prerequisite to relief.[10]

In this case, the plaintiff has alleged two independent causes of action: a breach of the union's constitution, a contract claim, and violation of section 101, a claim arising solely under the federal labor law. *Local 1397*, and the logic of *DelCostello* make clear that the section 101 claims are subject to the six month limitation period of section 10(b). Plaintiff's contract claim is in no way predicated upon the existence of a successful section 101 claim, however. Indeed, plaintiff's original complaint, brought in state court, alleged only a claim sounding in contract, and plaintiff's section 101 claims were not added until the filing of the plaintiff's amended complaint. Standing independent of plaintiff's claim created by the federal labor law, as it does, plaintiff's contract claim is subject to the borrowed New Jersey statute of limitations of six years for contract actions. N.J.Stat. Ann. 2A:14-1. The fact that defendant's breach of contract may have constituted an unfair labor practice or may have resulted in a violation of the plaintiffs' rights under section 101 does not make it any less a breach of contract, does not impair this court's jurisdiction under section 301, *Vaca v. Sipes*, 386 U.S. at 179–80, 87 S.Ct. at 911, citing *Smith v. Evening News Ass'n.*, 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962); *Local 174 v. Lucas Flour Co.*, 369 U.S. 95, 101 n. 9, 82 S.Ct. 571, 575 n. 9, 7 L.Ed.2d 593 (1962), and should not affect the applicable limitation period for the breach of contract claim. *Cf. O'Hare v. General Marine Transport Corp.*, 740 F.2d 160, 168 (2d Cir.1984) *cert. denied*, — U.S. —, 105 S.Ct. 1181, 84 L.Ed.2d 329 (1985) ("we

---

**10.** *Federation of Westinghouse Independent Salaried Unions v. Westinghouse Electric Corp.*, 736 F.2d 896 (3d Cir.1984), is not to the contrary. In that case, the Third Circuit held that a union's action against an employer to compel arbitration is subject to the six month limitation period of section 10(b). Although such an action is a "pure section 301" action in the sense that it involves a simple claim on a contract not intertwined with any claim for violation of a federally-created right, it is not a standard contract claim involving simply the traditional principles of contract law. The Third Circuit has previously recognized that arbitration is somewhat "sui generis'. *Service Employees International Union, Local 36 v. Office Center Services*, 670 F.2d 404, 409 (3d Cir.1982). Although the obligation to arbitrate is contractual, *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960); *DelGrosso v. Spang & Co.*, 769 F.2d 928, 933 (3d Cir.1985), there is a strong federal policy in favor of arbitration. *United Steel Workers*, 363 U.S. at 578, 80 S.Ct. at

1350. Any doubt as to whether a contract requires arbitration is to be resolved in favor of arbitration. *Id.* at 583, 80 S.Ct. at 1353; *Hahneman Univ. v. District 1199C*, 765 F.2d 38, 41 (3d Cir.1985). Arbitration is at the heart of the system of "industrial self-government" achieved through collective bargaining agreements. *United Steelworkers*, 363 U.S. at 580, 80 S.Ct. at 1351. As such, it is quintessentially one of "those consensual processes that federal labor law is chiefly designed to promote-the formation of the collective agreement and the private settlement of disputes under it," as to which the policy of uniformity and speedy resolution apply most strongly. *DelCostello*, 462 U.S. at 163, 103 S.Ct. at 2290. An action to compel arbitration is not so much an action for relief on the merits of the contract as it is a mechanism to set the wheels of "industrial self-government" in motion. It is therefore quite different from an action seeking relief on the merits under the terms of a contract, to which *Hoosier Cardinal* requires the application of a borrowed state statute of limitations.

agree with the district court that the *Del-Costello* holding turns on the particular nature of the duty of fair representation action, and cannot reasonably be expanded to all section 301 claims that involve facts which might also have established an unfair labor practice"). A contrary rule would be inconsistent with the body of law recognizing that contract actions under section 301 are to be governed by the "usual processes of law", despite the fact that the action complained of may constitute a violation of an independent federally created right. *Dowd Box Co. v. Courtney*, 368 U.S. at 513, 82 S.Ct. at 525. By exempting actions for breach of labor contracts from the jurisdiction of the NLRB and reserving it to the courts, Congress manifested an intent that the courts draw upon the body of state law.

 The court thus concludes that plaintiff's section 301 claims are governed by the six year New Jersey statute of limitation for simple contract actions. The plaintiffs having filed their complaints well within six years of the earliest date from which plaintiff's cause of action could have accrued—the date of notification that they were accepted as members but placed on the approved transfer list—the court finds that their claims for breach of the union constitution under section 301 are timely under the six year statute of limitations.

### (2) *Triggering of the Limitation Period*

Alternatively, the court notes that even if it did not conclude that the plaintiffs' 301 claims are subject to New Jersey's six year limitation period, it could not find plaintiffs' claims based on the union constitution to be untimely on this record. Again, the historical context of the plaintiffs' application for transfer is all important. After pursuing the right to acceptance into the local for fifteen years since the *Hughes* decision, would-be transferees into the Northern New Jersey Ironworkers Locals won two important victories. First, they won the right not to be rejected arbitrarily and without good cause in the *Moore* litigation. And, before Judge Meanor, they were successful in establishing that the terms of the *Plumbers Local* Consent Decree did not provide cause for the local's failure to effect the transfers. In the wake of Judge Meanor's ruling, 12 applicants were transferred into Local 11. Boyle Aff., ¶ 6.

According to the defendant, scores of transfer applicants seeking admission based on the precedent set in these victories, including the plaintiffs at bar, then filed for admission to the Local. After the rulings in *Moore* and by Judge Meanor, these applicants had every reason to expect that the local would finally recognize its obligation to accept them under the union constitution and would effect their transfer, as it had the transfers of their 12 predecessors. To confirm this expectation, these applicants were informed in letters from the local that they were accepted for membership and were promised admission. About the proposed delay in transferring them, applicants were told only that the local was "unable to immediately transfer into membership all such applicants." *See* Complaint, Exhibits A–E. Letters in response to the earlier applications indicated the number of applicants that could expect to be transferred that year, *see* Exhibits A, C & E, but letters responding to later applicants failed to provide even that information. *See* Exhibits B and D. Nothing in the letter served to inform the plaintiffs that the local would take more than five years to effect their transfers. Moreover, the letters assured the plaintiffs that "[n]o further action on your part will be required to gain admission." Exhibits A–E. Thus, the plaintiffs were not put on notice by these letters that their waiting period would extend into the better part of a decade, rather than lasting for only a few unobjectionable months, and they were encouraged not to take any immediate action to secure their admission.

While the union's action in placing the plaintiffs on an approved transfer list rather than immediately accepting them into membership was a technical breach of the union constitution, the plaintiffs could not have appreciated the fact that this action was truly adverse based on the letters of notification they received. The court of

appeals for this Circuit has previously recognized that a union member cannot be expected to take steps to obtain relief in the absence of a "definitive adverse action" signalling the need to seek relief. *Local 1075 v. Rubber Workers,* 716 F.2d 182, 187 (3d Cir.1983) ("[c]ertainly a *sine qua non* of an exhaustion requirement is the existence of some definitive adverse action from which the internal appeal must be taken"). Moreover, particularly in light of the local's assurances that they need take no action, it was entirely reasonable for the plaintiffs to wait for some amount of time, with the expectation that the local would fulfill its obligation under *Moore.*

The court thus determines that it would be fundamentally unfair to allow the local to rely on the letters sent to the plaintiffs as a trigger for any short statute of limitations. The letters are affirmatively misleading in that they appeared to be positive awards of membership, rather than notices of an adverse action. To allow the union to rely on these would be to reward its obfuscation of the true consequences its action held for the plaintiffs.

Notably, in a well-considered and insightful concurrence filed recently, Judge Becker of the Third Circuit identified the incentive behind and the consequences of such union obfuscation. *See Scott v. Local 863,* 725 F.2d 226, 229–31 (3d Cir.1984) (Becker J. concurring). Writing in the context of a *Vaca-Hines* hybrid action, Judge Becker observed that the twin defenses of failure to exhaust internal remedies and running of the statute of limitations give union members a "narrow window" within which to file suit: the union member is required to pursue grievance procedures until it appears that they are futile; then, as soon as this futility becomes apparent, the six month limitation period begins to run. Judge Becker noted that this twin set of strictures on the potential plaintiff gives the union an incentive to "be equivocal or contradictory in their communications to dissatisfied members," *id.* at 230, so that the plaintiff will be unsure as to whether he is required to continue seeking relief in the union, or should be rushing instead to court. As a result, the Judge observed,

[s]everal harmful consequences are likely to follow from court-inspired vagueness of these union communications. First will come a guessing game. To determine whether a plaintiff's suit can go forward, overburdened district courts will be remitted to a tedious and often useless search through the vagaries of union bylaws or will be forced to rationalize informal union procedures likely to have been invented for each dispute. If it is thereby determined that the suitor has not exhausted, his day in court is, at worst, delayed. But if, in reliance on what he thought were genuine internal remedies, he refrains from suing for as much as six months, and it is ultimately determined that these remedies were illusory, his suit will be forever barred. Second, to avoid this trap, employee plaintiffs will have to file numerous precautionary lawsuits—each of which will require the courts to undertake the bootless inquiry described below—in the hopes that perhaps one of the suits will have been timed correctly.

*Id.* at 231. A union's incentive to exploit a guessing game strategy is of most concern in a case like this one, where there is no hope that the union's own "internal majoritarian processes" will correct the abuse because the very harm suffered by the affected plaintiffs is an exclusion from the union's processes of self-governance. *See id.* Judge Becker concluded that a union should be able "to start the *DelCostello* statute of limitations running only from the time that the employee has received from it a clear, written statement telling him that further internal appeals are futile, and the time for judicial action has begun . . . analogous to a right to sue letter in employment discrimination law." *Id.*

This case presents a variation on the theme sounded by Judge Becker. By failing to give the plaintiffs a clear notice that their placement on the approved transfer list was an appealable adverse action, choosing rather to cloak the notice as one of acceptance and to assure the plaintiffs that no immediate action on their parts was necessary, the defendant succeeded in lull-

ing the plaintiffs so that they would not appreciate the adverse effect of the union's action until, according to defendant, relief was foreclosed. Under the defendant's theory, the plaintiffs are to be penalized for their reliance on relief promised them by the union, which ultimately proved to be illusory because of the passage of an unreasonable amount of time. The court cannot accept this argument. Aside from its unfairness, it would create a rule requiring union members to immediately appeal any delay in action by the union, regardless of the union's assurance that no such appeal is necessary. Rather than resulting in a swift resolution of disputes, such a rule would only serve to engender disputes and ultimately to clog the courts with disputes better left to internal resolution. Thus, even if the plaintiffs' claim based on the union's constitution were subject to the short six month limitation period of section 10(b) of the NLRA, the court finds that the running of this period could not have been triggered by the plaintiff's receipt of the letters relied upon by defendant, but only by their realization over time that the relief promised them by the local was not forthcoming within a reasonable period of time.

### (B) *Section 101 Claims*

■ In contrast to plaintiffs' claims under the union constitution, plaintiffs' claims under section 101 of the LMRDA are clearly subject to the six month limitation period of section 10(b). *Local 1397, supra.* Yet, as the court has previously ruled, *see* Bench Opinion (2/14/85), these claims are not untimely. As the court noted in its prior opinion, the defendant's discriminatory treatment of plaintiffs has been repeated and ongoing. *See* Bench Opinion at 8, citing *N.L.R.B. v. Actor's Equity Assn.* 644 F.2d 939 (2d Cir.1981); *N.L.R.B. v. Local 269,* 357 F.2d 51, 56 (3d Cir.1966); *Melville Confections, Inc. v. N.L.R.B.,* 327 F.2d 689 (7th Cir.), *cert. denied,* 377 U.S. 933, 84 S.Ct. 1337, 12 L.Ed.2d 297 (1964); *see also Lewis v. Local 100,* 750 F.2d 1368, 1378–79 (7th Cir.1984) (repeated failure to refer plaintiff out of hiring hall constituted continuing violation, and plaintiff could bring suit for any discriminatory acts oc-

curring within six months prior to filing of complaint under section 10(b)); *N.L.R.B. v. Al Bryant, Inc.,* 711 F.2d 543 (3d Cir.1983) *cert. denied* 464 U.S. 1039, 104 S.Ct. 699, 79 L.Ed.2d 165 (1984) (plaintiff's claim with respect to union's continuing failure to abide by collective bargaining agreement within six months preceding filing of complaint was timely under section 10(b) despite fact that union had initially repudiated agreement more than six months before); *J. Ray McDermott & Co. v. N.L.R.B.,* 571 F.2d 850, 858 (5th Cir.), *cert. denied,* 439 U.S. 893, 99 S.Ct. 250, 58 L.Ed.2d 238 (1978) (fact that employer's refusal to bargain was repeated did not bar suit on refusals within six months preceding filing of complaint under section 10(b)).

The cases principally relied upon by defendant are not to the contrary. *See Vallone v. Local 705,* 755 F.2d 520 (7th Cir. 1984); *Bedat v. McLean Trucking Co.,* 119 LRRM 2945 (D.Conn.1984); *Adkins v. General Motors Corp.,* 573 F.Supp. 1188 (S.D. Ohio 1983). These cases were all suits challenging a union's decision not to arbitrate a grievance, or otherwise to breach its duty of fair representation, a discrete act which was, in itself, the conduct found offensive. Here, the action from which defendant claims the limitation period should date, the issuance of the notification letters to the plaintiffs, did not in itself constitute a violation of section 101. Rather, given the plaintiffs' status after issuance of these letters, defendant's repeated and ongoing failure to afford them the rights guaranteed them under section 101 amounted to the violation of section 101. *Cf. Lewis v. Local 100,* 750 F.2d at 1379 (plaintiffs' complaint of union's failure to refer him out of hiring hall "alleges a continuing course of conduct ..., not one particular instance in which, for example, the Union failed to process a grievance concerning discharge or promotion"). Defendant's argument makes as much sense as to say that a union member's receipt of a notice of admission into membership triggers the limitation period for any subsequent discriminatory act against him. Such a position is, of course, untenable.

The court accordingly concludes that plaintiffs' claims under section 101, like their claims based on the union's constitution, are timely.

## CONCLUSION

For the foregoing reasons, the court determines that plaintiffs are entitled to relief on their claims under the union constitution and under section 101 of the LMRDA, and that said claims are not untimely under the applicable statutes of limitation. In light of correspondence from counsel for the parties to the court indicating that the circumstances of the plaintiffs may have changed since this motion was filed, the parties are directed to submit briefs within 20 days indicating their positions as to the relief that should be ordered by the court in accordance with this opinion. Furthermore, the court requests that plaintiffs submit proposals for sanctions in the event the defendant continues to ignore rulings of the courts or engages in further subterfuges to avoid their implementation.