641 F.Supp. 1024 (1986)
Kelly MERK, Joseph Staszewski, Vickie Menagh, Donna McCormick, David Therkield, John Malone, Marlene Wagner, Michael Demare, Wayne Volker, Eleanore Collins, Andrew Kachik and Patricia Todd, on Behalf of Themselves and all Others Similarly Situated, Plaintiffs,
v.
JEWEL FOOD STORES DIVISION, JEWEL COMPANIES, INC., American Stores Company, Inc., and United Food and Commercial Workers Union, Local 881, Chartered by United Food and Commercial Workers International Union AFL-CIO and CLC, Defendants.
No. 85 C 7876.
United States District Court, N.D. Illinois, E.D.
June 26, 1986.
*1025 Jack Bartler, William Cremer, McKenna, Storer, Rowe, White & Farrug, Wheaton, Ill., James P. DeNardo, Barry S. Hyman, McKenna, Storer, Rowe, White & Farrug, Chicago, Ill., for plaintiffs.
Robert Karmel, Neal D. Rosenfeld, Jairus M. Gilden, Karmel & Rosenfeld, E. Allan Kovar, Kovar, Nelson & Brittain, Chicago, Ill., for defendants.

MEMORANDUM OPINION AND ORDER
ASPEN, District Judge:
This case presents difficult labor law issues which appear to be of first impression. The plaintiffs are part of a putative class of former supermarket employees of defendant Jewel Food Stores ("Jewel"). Their three-count complaint under § 301(a) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a),[1] while pleading alternative and inconsistent claims for relief, seeks one remedypayment of back wages which Jewel allegedly owes plaintiffs under a collective bargaining agreement. Counts II and III are against Jewel and the defendant Union respectively, and together comprise the familiar "hybrid" suit. These counts rest on the existence and breach of a duty of fair representation owed to plaintiffs by the Union. Count I is a direct § 301 claim against Jewel only; it rests on the alternative theory that the Union owed no duty of fair representation to these former employees. The Union has moved for summary judgment on Count III, arguing among other things that it owed no duty to plaintiffs. For the reasons stated below, we agree with the Union and must necessarily dismiss the entire hybrid part of the suit, that is, both Counts II and III. We also have before us Jewel's motion to dismiss Count I, which argues that the direct suit is barred by the six-month statute of limitations set forth in *1026 Del Costello v. International Brotherhood of Teamsters, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983). For the reasons stated below that motion is denied.

I.
The following facts appear to be undisputed. On October 20, 1983, the Union and Jewel entered into a three-year collective bargaining agreement which was effective retroactive to September 19, 1982, and ran to June 15, 1985. Jewel runs about 180 supermarkets in and near Chicago employing some 16,000 workers represented by the Union. In January 1984 the Union and Jewel started haggling over a modification of the Agreement. Jewel says it believes that the Union had agreed orally in 1982 to reopen the contract for negotiation when the discount "Cub Food Stores" chain was to begin operations. Jewel says that under this oral "reopener" agreement it had the right to unilaterally implement any final offer it made, if the "reopened" negotiations reached impasse. The Union says it made no such agreement, but agreed to meet with Jewel in January 1984 to discuss a proposal by Jewel to cut wages and benefits.
These negotiations got nowhere, and on February 26, 1984, in accordance with what it called its "final offer at impasse," Jewel unilaterally cut wages and benefits below levels specified in the 1982-85 Agreement. The wage cuts were as high as $1.25 per hour, and vacation and personal day benefits were reduced as well. The Union demanded arbitration,[2] Jewel refused and so the Union sued Jewel to compel arbitration. United Food & Commercial Workers Union, Local 881 v. Jewel Food Stores Division, Jewel Companies, Inc., No. 84 C 1648 (N.D.Ill.). The Union also lodged an unfair labor practice charge with the National Labor Relations Board ("NLRB").[3]
In December 1984, the NLRB urged Jewel and the Union to try to negotiate a settlement. The parties met and did not agree. However, the Union submitted Jewel's offer to the rank and file, who followed the Union's recommendation to reject the offer. Negotiations continued into the spring.
On April 9, 1985, the District Court granted the Union's motion for summary judgment and ordered Jewel to arbitrate. Jewel filed a notice of appeal. Before anything came of the court proceedings, however, the Union and Jewel began more intense and fruitful negotiations. In light of the imminent expiration of the Agreement on June 15, 1985, they combined negotiations over the wage and benefit cut with talks over a new collective bargaining agreement. After a few meetings, Jewel proposed a settlement on May 19, 1985, which would restore most of the wages and benefits to their previous level and also would provide full retroactive pay for wages lost because of the cuts. However, this latter offer extended only to employees then on the payroll. The Union submitted the proposal to the membership and recommended acceptance. On June 21, 1985, more than 80% of current employees voted to ratify the new contract and the settlement agreement. As a result, the parties dismissed the Court suit and asked the NLRB to drop its proceedings, which it did.
The plaintiffs are part of a putative class, containing perhaps as many as 2,000 members, of former Jewel employees who were not part of the above settlement. The class includes employees who retired, who quit or who were fired at various *1027 points during the fifteen months of the protracted battle. That the class should be so large is not surprising, since turnover is, we presume, normally high in the supermarket industry. Because the settlement included only employees of Jewel as of June 21, 1985, plaintiffs received no retroactive pay for the time they worked during the dispute at the reduced salary. Since they were former Jewel employees and ex-members of the Union, they could not and did not vote on the June 21, 1985 settlement; nor could they wield political power within the Union. They were not notified of the proposed resolution and, specifically, were not told that the resolution would not include them. They must have learned about it somehow, though, because they filed this suit on September 10, 1985, less than three months following the settlement.
Counts II and III form a traditional "hybrid" suit in the mold cast by Hines v. Anchor Motor Freight, 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976) and Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). Count II alleges that Jewel breached the 1982-85 Agreement by cutting plaintiffs' wages; Count III alleges that the Union breached its duty of representing plaintiffs fairly when it reached a settlement which left them high and dry. The twist in this case, though, is that plaintiffs were former employees when the settlement was reached. They claim, in the alternative, and the Union agrees, that the Union owed no duty to these former members. To protect themselves, plaintiffs amended their original complaint to add an alternative theory in what is now Count I, a direct suit under § 301 against Jewel only.
The first issue is whether the Union owed the plaintiffs a duty of fair representation after they left Jewel. While the Union and the plaintiffs agree that no continuing duty existed, we still must decide the question, since Jewel claims that the duty existed. All parties apparently agree about the legal and practical consequences of our decision on this issue. If Jewel is right that the duty existed, then plaintiffs are limited to their hybrid suit in Counts II and III, and we must grant Jewel's motion to dismiss the direct suit, Count I. This result would favor Jewel and hurt the ex-employees, since to recover they would have to carry the substantial burden of showing in Counts II and III that the Union breached its duty of fair representation. However, if the plaintiffs and the Union are right that the duty vanished when plaintiffs did, then plaintiffs will proceed on Count I only. To recover the plaintiffs would need only show that Jewel breached the contract; with the Union out of and irrelevant to their claim, their task would be lighter and Jewel's exposure greater.
This latter result, which we reach below, raises a second issue. We must decide whether the six-month statute of limitations of § 10(b) of the NLRA applies to the direct suit. We will take up the two issues in order below.

II.
The duty of fair representation is a creature of the judiciary, created as a necessary complement to the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 et seq. The duty exists because the NLRA makes certified labor unions the exclusive bargaining representative of all employees in the bargaining unit. See Frandsen v. Brotherhood of Railway, Airline and Steamship Clerks, 782 F.2d 674, 678-79 (7th Cir.1986). Since the policy of exclusivity strips employees of normal methods of redress, for their protection, the employees' exclusive representative, the Union, necessarily has the duty "to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." Vaca v. Sipes, 386 U.S. 171, 177, 87 S.Ct. 903, 909, 17 L.Ed.2d 842 (1967). However, this duty of fair representation extends no further than the Union's authority under § 9(a) of the NLRA, 29 U.S.C. § 159(a), to act as the exclusive representative of the bargaining unit. See, e.g., Freeman v. Local Union No. 135, *1028 Chauffeurs, Teamsters, Warehousemen and Helpers, 746 F.2d 1316, 1320-21 (7th Cir.1984). Thus, if the Union is not the exclusive representative of an employee, it has no corresponding duty to represent that employee fairly or at all. See id. at 1321.
The Union's authority to be exclusive representative is created and defined by the NLRA, and this authority exists only if a majority of "employees" in a "unit appropriate" for collective bargaining have elected the Union to be their exclusive representative. See § 9(a), 29 U.S.C. § 159(a). The Act defines "employee" in § 2(3), 29 U.S.C. § 152(3) as follows:
The term "employee" shall include any employee, and shall not be limited to the employees of a particular employer, unless this chapter explicitly states otherwise, and shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment....
The employer has a duty to bargain only with the Union representing "his employees" about wages, hours and the terms and conditions of employment. See 29 U.S.C. § 158(a)(5), § 158(d).
The plaintiffs and the Union make a simple and persuasive argument based on the above standards and definitions. When plaintiffs left Jewel, they were not "employees" of Jewel any longer, not "his employees," but ex-employees. Moreover, they were ex-members of the bargaining unit. They no longer paid dues and exercised no power within the Union. Not only would it defy common sense to make the Union exclusive representative of departed employees, it would be unfair to the ex-employees and the Union to do so. If the duty of fair representation lingered after the plaintiffs left Jewel, they would have been subject to the Union's exclusive representation but have had no control over their representatives. Unlike current employees who can vote against proposed contracts they do not like, vote against Union officers they do not like or try to decertify the Union altogether, the ex-employees would be stuck with a representative who is not beholden, and therefore unresponsive, to them.[4] If the duty existed, the Union would be forced to deal with an intolerable conflict of interest between its simultaneous duty to current and ex-employees. It would inevitably sacrifice the interest of ex-employees in order to satisfy current employees, who wield present and future power in the Union. To hold that the Union had a duty to continue representing *1029 plaintiffs would be tantamount to holding, that it had a duty to achieve the impossible.[5]
None of the parties cited any cases on point. However, the plaintiffs did cite a few cases which are analogous to this case. Most important is Allied Chemical & Alkali Workers of America, Local Union No. 1 v. Pittsburgh Plate Glass Co., 404 U.S. 157, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971), where the Court held that "retirees" are not "employees" as defined in § 2(3) of the NLRA. The Court also held that the retirees "were not and could not be `employees' included in the bargaining unit." 404 U.S. at 172, 92 S.Ct. at 394. The Court reasoned that the NLRA's scheme requires that a bargaining unit include only employees with mutual interests in the terms and conditions of employment. "Such a mutuality of interest serves to assure the coherence among employees necessary for efficient collective bargaining and at the same time to prevent a functionally distinct minority group of employees from being submerged in an overly large unit." Id. at 172-73, 92 S.Ct. at 394. The Court emphasized that the inclusion of retirees with current employees in one bargaining unit creates a serious conflict of interest rendering such a unit unworkable: the retirees are interested primarily or exclusively in pension-related issues, and not in the full range of issues of interest to current employees, such as wage rates, hours, working conditions, etc. With such a narrow interest at odds with other interests, retirees would "create the potential for severe internal conflicts that would impair the unit's ability to function and would disrupt the processes of collective bargaining." Id. In addition, there is the great danger that the Union would favor active employees over retirees. Id.
The retirees and other former employees in this case are analogous to the retirees in Allied Chemical. Whether or not they remained "employees" under § 2(3) of the NLRA, they were no more proper members of the bargaining unit once they left Jewel than were the retirees in Allied. The potential conflict of interest in such a situation is great, and, in fact, the record suggests that fears of a conflict of interest proved well-founded in this case.[6] Once they left, the plaintiffs had one narrow interestrecovering lost wages. The employees left behind had a much broader range of interests, including obtaining good future wages and working conditions, as well as securing future peace and stability in the form of a new collective bargaining agreement. The current employees had everything to gain and nothing to lose by *1030 cutting plaintiffs loose without a remedy. In leaving plaintiffs out of the agreement they gave up nothing of economic value to themselves, but gave Jewel an economic plum. Because Jewel apparently took a hard line as to plaintiffs, current employees could not have helped plaintiffs without hurting their own position. This is a classic case of conflict of interest. If plaintiffs indeed remained part of the bargaining unit, they were nothing but a bargaining chip and helpless to prevent their former brothers and sisters from reluctantly tossing them onto the bargaining table.
Both of the factors Allied Chemical highlighted as important to a proper bargaining unitcoherence necessary for efficient bargaining and the lack of a submerged, distinct minority groupare relevant here. The plaintiffs were not and could not have been involved in the collective bargaining for a new contract, yet their sole interest would have become enmeshed in that process had they remained part of the unit. The parties very sensibly collapsed the negotiations over the wage cut with those over a new agreement. But plaintiffs could only have hindered that bargaining process if the Union had to account for and stand behind their interests. That is precisely why the Union gave up on plaintiffs' claims. See nn. 5 & 6 above. Moreover, our above discussion makes clear that if plaintiffs were indeed lingering members of the Union for the one purpose of their wage claim, they were indeed an isolated and submerged minority sect. The rationale of Allied Chemical argues against this result, and Jewel does not adequately deal with this rationale in its briefs. Following Allied Chemical, then, we hold that the plaintiffs were no longer proper members of the bargaining unit when they left Jewel.[7] They were like any other worker who quits a companyan ex-employee and ex-Union member. As we have seen, it would have been unworkable to define them as lame duck members of the unit for the sole and limited purpose of waiting for a settlement. It follows from this that the Union owed plaintiffs no duty of fair representation.
Jewel argues that the analysis above overlooks a crucial distinction between the retirees of Allied Chemical and the retirees and other former employees of this case. There, as in other cases cited above in n. 7, the employer allegedly harmed the retirees after they had already severed their employment by retiring. In contrast, here all the plaintiffs were by definition active Union members under the Union's yoke, when Jewel cut their wages. When this happened the Union protested on plaintiff's behalf and sued to compel arbitration. Jewel essentially argues that once properly subject to the Union's efforts, plaintiffs were bound to the results of this process no matter how long it took and what changed in the meantime. Jewel relies on an analogy to the common situation where a Union must represent a discharged employee to try to get him or her reinstated, even though such an employee no longer works for the employer or pays Union dues while waiting for the outcome of the grievance.
Jewel's analogy suffers from several flaws. First, and most importantly, Jewel dances around the serious and inherent conflict of interest implicated in this case. In the typical case of one or a few discharged employees, there are simply no profound, inevitable conflicts, although some rather minor ones may sometimes appear. In this respect, the Union's reliance on D'Amato v. Wisconsin Gas Co., 760 F.2d 1474, 1475 (7th Cir.1985) is misplaced.[8] *1031 It is one thing to say that the Union owes a continuing duty to one or a few employees unjustly fired. Fulfillment of such a duty works no meaningful harm on other employees in the bargaining unit. The only ones harmed, if at all, are those with less seniority, and that harm is slight. See n. 8 above. It is quite different to leap to a conclusion that the Union must, or even can, continue to represent adequately a class of up to two thousand former employees, all of whose narrow interests are diametrically opposed to those of every current employee. As we explained above, that would be like giving plaintiffs' two enemies the chance to play with plaintiffs' fate. In sum, while the Union can feasibly represent both the hypothetical discharged employees and those who remain, it could not balance the conflict between plaintiffs and Jewel's current employees.
Second, the duty to represent the discharged employee is clearly grounded in the NLRA. Such employees plainly fall within the definition of "employee" in § 2(3), which includes "any individual whose work has ceased as a consequence of, or in connection with any current labor dispute or because of any unfair labor practice." No one disputes that Congress intended that a vital function of the Union would be to protect "employees" fired in breach of a collective bargaining agreement or in violation of the NLRA. But plaintiffs do not fall so plainly within the definition of employee, and, unlike the case with discharged employees, we have no clear indication of congressional intent that a Union must continue to represent ex-employees like plaintiffs.
Jewel's analogy also fails for a third, related reason. In the case of the discharged employee, the employee's unwelcome new status as "ex-employee" results from the employer's unlawful act of firing him or her. That is, the employer makes the employee an erstwhile employee; the breach of contract or unfair labor practice confers the new status. The ensuing grievance centers around the employee's status: will she be unemployed or re-employed? In sum, the wrong ruptures and the remedy repairs the employment relationship. Because the existence of this relationship is the very issue in dispute and, indeed, lies at the intersection of the collective bargaining and employment relationships, the employer cannot conclusively make the employee an ex-employee and ex-member of the Union simply by "terminating" him or her. The employment status remains unresolved until the dispute is resolved. In contrast, the dispute in this case does not involve plaintiffs' status as "employees" of Jewel or as "members" of the Union. Win or lose, they are and will remain former employees with no continuing ties to Jewel. Because plaintiffs' employment status is already long resolved, Jewel incorrectly equates them with discharged employees seeking reinstatement. Indeed, this distinction between former employees who do not want to return and discharged ones wanting their jobs back partly explains the deep conflict of interest detailed earlier. The interests of fired employees generally harmonize with those of current employees, and coincide if they get their remedy. Their long-term interests are very much in line, and thus the Union must represent discharged employees unless and until they lose their grievance. But in seeking their remedy plaintiffs have aligned themselves against the interests of all current employees. They seek only one thing and share no long-term interests with current employees. They simply do not properly belong in the bargaining unit.
*1032 Jewel also argues that plaintiffs' argument runs afoul of the NLRA's fundamental policy of exclusive representation. Like the previous argument, this contention sidesteps the conflicts of interest in this case. As Allied Chemical shows, "exclusive representation" does not mean "all-inclusive exclusive representation." Rather, only "appropriate" units may be certified. Our result is consistent with the policy of exclusive representation as it defines a unit for which exclusive representation can work appropriately. We have frustrated the NLRA's policy no more than Allied Chemical did.
We must emphasize the narrowness of our holding that the Union owed no duty of fair representation to plaintiffs when the settlement was reached. It depends both on plaintiffs' status as ex-employees of Jewel and on the serious conflict between their narrow interest and the interest of other employees.[9] Neither side cited, and we did not find, any case like this one, and given the rare circumstances, we think Jewel cries wolf when it laments that "[a]cceptance of Plaintiffs' position in this regard would effectively preclude management from ever relying on a Union resolution of a grievance for anyone that was not currently employed. Management would be deprived of the benefit of its contractual bargain, and the collective bargaining relationship would be seriously undermined." (Emphasis added.) Our holding carries no such broad ramifications. As we have described, our reasoning does not apply to employees fired in violation of a collective bargaining agreement. In any event, Jewel has not shown that it "relied" on Union resolution of the grievance on behalf of plaintiffs. The evidence suggests that Jewel insisted that plaintiffs be cut loose. The Union was not legally plaintiffs' exclusive agent any longer, and it appears that the Union reluctantly abandoned plaintiffs at Jewel's insistence. If Jewel "relied" on anything, we suspect it relied on its own bargaining gamble that it could save a great deal of money by trying to bind plaintiffs to a deal in which they were as a practical matter unrepresented and powerless. If Jewel thought it could profit by the inherent conflict of interest in this case and bind plaintiffs to the result, it was simply mistaken and must live with the consequences. The new contract is not undermined as a result. Jewel simply makes a false legal assumption in signing it. And far from "depriving management of its contractual bargain," our result will help ensure that Jewel lives up to its original bargain and that plaintiffs enjoy the benefit of that bargain.[10] Of course, we express no opinion now on the merits, that is, on whether there was in fact a breach which deprived plaintiffs of their bargain.
In sum, we conclude that in this unique case the Union had no continuing duty to represent plaintiffs when it finally settled its dispute with Jewel. Accordingly, the hybrid suit, Counts II and III, must be dismissed, and the employees may properly proceed in Count I against Jewel alone.

III.
We come, then, to Jewel's alternative argument that a direct suit in Count I is barred by the statute of limitations. For the following reasons, we do not think that the six-month limitations period of § 10(b) of the NLRA properly applies to this direct suit which is essentially one for breach of contract. Instead, Illinois' five-year limitations period for breach of oral contract controls this suit.

A.
The parties agree that interpretation of Del Costello v. International Brotherhood *1033 of Teamsters, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983), is crucial to analyzing the issue. Del Costello was a traditional hybrid suit under § 301, in which the employee alleged that he was discharged in violation of the collective bargaining agreement, and that the union had prosecuted his unsuccessful grievance "in a discriminatory, arbitrary, and perfunctory manner." The suit was filed just under six months after the arbitration result became final.[11] The district court dismissed the suit, applying Maryland's thirty-day limitations period for suits to vacate arbitration awards. The Court of Appeals affirmed. The Supreme Court reversed, holding that the six-month limitations period of § 10(b) of the NLRA was the most analogous and proper one for this type of hybrid suit. The Court's rationale took several steps which we shall detail.
The Court began by noting that § 301's omission of a limitations period required it to borrow a period from some other source. The norm is to borrow the most appropriate state statute of limitations, as the Court did in Auto Workers v. Hoosier Cardinal Corp., 383 U.S. 696, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966), but the Court noted it could in unusual circumstances deviate from the norm, if borrowing a state period would frustrate or interfere with national policy. The Court carefully distinguished the hybrid suit from the "straightforward suit under § 301" in Hoosier Cardinal, where borrowing a state limitation for breach of contract was held proper. 462 U.S. at 162-63, 103 S.Ct. at 2289. In Hoosier Cardinal the union rather than the employee sued the employer over a collective bargaining agreement which had no grievance or arbitration mechanism. The Hoosier Cardinal Court refused to adopt a uniform federal standard, finding that the case was closely akin to a "normal" state law breach of contract suit, and as such did not directly involve "those consensual processes that federal labor law is chiefly designed to promotethe formation of the collective agreement and the private settlement of disputes under it." 383 U.S. at 782, 86 S.Ct. at 1111. In contrast, Del Costello emphasized how the typical hybrid suit does implicate these dual consensual processes. Because the hybrid suit requires the employee to show the Union breached the duty of fair representation, it directly challenges the private settlements of disputes under the collective bargaining agreement. 462 U.S. at 164-65, 103 S.Ct. at 2290-91.
Not only is the compound, hybrid suit therefore unlike a simple contract suit, the Court felt that as a uniquely federal creature the hybrid suit has no close analogy in ordinary state law. Neither normal contract limitations periods nor those of arbitration suits fit it well. The latter periods are typically too short to protect employees who are generally green in matters of collective bargaining; and the employees' § 301 claim against the union stems from policies unrelated to those underlying the decision about a proper arbitration period. Not only are arbitration periods too short, statutes for breach of contract or for malpractice[12] are too long. The machinery for resolving Union disputes would become unstable if its resolution can be tampered with many years later. 462 U.S. at 165-68, 103 S.Ct. at 2291-92.
Finding no analogous state law period for the hybrid suit, the Court turned to and found a quite suitable period in federal law, § 10(b) of the NLRA. That section requires charges of unfair labor practices to be brought before the NLRB within six months. The court noticed a "family resemblance" between an unfair labor practice and the breach of the duty of fair representation. Because Congress already fine-tuned this six-month period to balance the federal interests in stable bargaining and finality of disputes against the employee's interest in having time to set aside an *1034 unjust settlement, the Court found § 10(b) to be an apt period for that cousin of the unfair labor practice casethe hybrid suit. 462 U.S. at 169-71, 103 S.Ct. at 2293-94. The Court stressed, however, that in applying a uniform, federal period it was taking an unusual, though not unprecedented, step, and that its "holding ... should not be taken as a departure from prior practice in borrowing limitations periods for federal causes of action, in labor law or elsewhere. We do not mean to suggest that federal courts should eschew use of state limitations periods anytime state law fails to provide a perfect analogy." 462 U.S. at 171-72, 103 S.Ct. at 2294.
Despite the Court's limitation of the holding in Del Costello, the lower federal courts have been applying Del Costello rather liberally in § 301 suits, and even in other labor law contexts. For example, it is probably true that Del Costello now applies to any hybrid suit under § 301, not just to suits to vacate a grievance, which Del Costello was. See, e.g., Flores v. Levy Co., 757 F.2d 806, 808-09 (7th Cir.1985) (and cases cited therein); Taylor v. Ford Motor Co., 761 F.2d 931, 932 (3d Cir.1985), cert. denied, ___ U.S. ___, 106 S.Ct. 849, 88 L.Ed.2d 890 (1986). Moreover, several courts have applied Del Costello to suits between unions and employees under Title I of the Labor Management Reporting & Disclosure Act ("LMRDA"), 29 U.S.C. § 411-412. See, e.g., Davis v. Auto Workers, 765 F.2d 1510 (11th Cir.1985), cert. denied, ___ U.S. ___, 106 S.Ct. 1284, 89 L.Ed.2d 592 (1986); Vallone v. Teamsters Local No. 705, 755 F.2d 520, 521-22 (7th Cir.1985); Local Union 1397 v. Steelworkers, 748 F.2d 180, 182-84 (3d Cir.1984); but see Doty v. Sewall, 784 F.2d 1, 3-10 (1st Cir.1986); Rodonich v. House Wreckers, 624 F.Supp. 678, 681-93 (S.D.N.Y.1985); Testa v. Gallagher, 621 F.Supp. 476, 477-78 (S.D.N.Y.1985). However, the courts have eschewed Del Costello in favor of state law periods in some labor cases under § 301. For instance, a suit between an employee against a union alleging a breach of the union's own constitution was held to be essentially contractual and governed by the state law limitations period for breach of contract. Papianni v. International Ass'n of Bridge, Structural and Ornamental Iron Workers, Local 11, 622 F.Supp. 1559, 1572-76 (D.N.J.1985). Similarly, a suit under § 301 by trustees of a pension fund against an employer for failure to contribute to the fund in violation of a collective bargaining agreement was held subject to the six-year limitations period for breach of contract. O'Hare v. General Marine Transport Corp., 740 F.2d 160, 167-68 (2d Cir.1984), cert. denied, ___ U.S. ___, 105 S.Ct. 1181, 84 L.Ed.2d 329 (1985). And when a third party employer sues a union under § 303 of the LMRA because of a secondary boycott, a state law period for tortious interference with business relations is more analogous than § 10(b). See Carruthers Ready-Mix v. Cement Masons, 779 F.2d 320, 324-27 (6th Cir.1985); Monarch Long Beach Corp. v. Soft Drink Workers, 762 F.2d 228, 230-31 (2d Cir. 1985), cert. denied, ___ U.S. ___, 106 S.Ct. 569, 88 L.Ed.2d 554 (1985); Park Electric Co. v. Electrical Workers, 593 F.Supp. 1060, 1063-65 (N.D.Ill.1984) (Plunkett, J.). Finally, a non-hybrid suit brought under § 301 by an employer or union to vacate an arbitration award is controlled by the state law period governing suits challenging such awards. Plumbers Pension Fund v. Domas Mechanical Contractors, Inc., 778 F.2d 1266, 1268-70 (7th Cir.1985).
As the above summary of Del Costello and its offspring suggests, this Court and the parties have had no better luck finding cases on point than we did when dealing with the duty of fair representation issue. However, the above cases offer some help. Viewed together, the cases show that Del Costello extends beyond its facts, probably to any hybrid suit under § 301, and sometimes beyond § 301; but Del Costello has not swallowed all federal labor disputes or even all § 301 suits. The cases share the same approach to the issue. They analyze the rationale of Del Costello to see whether its logic applies sensibly to the peculiarities of the case at bar. See, e.g., Plumbers Pension Fund, 778 F.2d at 1268-70. We *1035 do the same below. While the question is close, we hold that the case resembles Hoosier Cardinal more than Del Costello and therefore a state limitation period for breach of contract controls.

B.
At the outset, we observe that the Supreme Court in Del Costello left the holding of Hoosier Cardinal intact, albeit narrowed, and emphasized that resort to state law "remains the norm for borrowing of limitations periods." 462 U.S. at 171, 103 S.Ct. at 2294. Del Costello deviated from the norm because of several characteristics of the hybrid suit which make it a special creatureof a species apart from the straightforward contractual dispute of Hoosier Cardinal. See O'Hare, 740 F.2d at 168 (Del Costello "turns on the peculiar nature of the duty of fair representation action, and cannot reasonably be expanded to all Section 301 claims that involve facts which might also have established an unfair labor practice charge.") The key to the hybrid suit is the breach of the duty of fair representation, which as we saw in Part II above flows from the federal labor policy of exclusive representation. That policy is implicated in every hybrid suit. Moreover, the hybrid suit typically challenges the result reached by the consensual process this exclusive representative, the Union, and management have engaged in; it usually entangles either the formation of a collective bargaining agreement or, more typically, the private settlement through grievance or arbitration of a dispute under one. Congress designed the six-month period of § 10(b) with these policies, among others, in mind.
This unique case differs from the typical hybrid suit like Del Costello in several fundamental ways. No duty of representation is involved, so, as we held above, it is a direct rather than hybrid suit. This alone makes the case look more like Hoosier Cardinal than Del Costello. But more importantly, plaintiffs fell outside of the normal private dispute resolution machinery. Once they left Jewel, they also fell outside of the future collective bargaining process. Regardless of how the case turns out on the merits, the private settlement that Jewel and the Union reached will remain intact and unchallenged. The active employees will have received their settlement, and both sides will continue to be bound by their new collective bargaining agreement. Unlike the typical hybrid suit, which seeks to modify a collective bargaining agreement or to overturn a result reached through a grievance or settlement of a dispute under such an agreement, this case does not intrude on the new contract or settlement reached between Jewel and the Union. This result flows naturally from the holding that no duty of representation existed. The plaintiffs' rights and their remedy are distinct from those of current employees. In short, because plaintiffs were not part of any settlement, this case, unlike Del Costello, does not directly implicate "those consensual processes that federal labor law is chiefly designed to promote."[13] 462 U.S. at 163, 103 S.Ct. at 2289. Section 10(b), which was designed to strengthen and defend the stability of bargaining relationships and to protect a collective bargaining system from delayed attack, see United Parcel Service v. Mitchell, 451 U.S. 56, 68, 101 S.Ct. 1559, 1567, 67 L.Ed.2d 732 (1981) (Stewart, J., *1036 concurring), does not pertain to this case, since plaintiffs fell out of the bargaining relationship and system and have no continuing relationship with Jewel.
Papianni v. Iron Workers, 622 F.Supp. at 1572-76, offers a slightly different approach which yields the same conclusion. In holding that a suit for breach of a union's constitution is not covered by Del Costello, the court distinguished its case from one "absolutely predicated on the existence of an implied claim under the NLRA, or some other federally created right." Id. at 1575. Del Costello would apply to such suits with a basic "predicate" in federal law or policyhybrid suits, LMRDA suits, suits to compel arbitration while Hoosier Cardinal remains in control of straight, non-hybrid § 301 suits essentially predicated on breach of contract. Id. Applying this "predicate" approach, we see that this suit is not predicated on the duty of fair representation or directly on other substantive federal rights, but simply on the breach of a contract, as was the case in Hoosier Cardinal. To hold that Del Costello controls this case would be to hold, in effect, that it overruled Hoosier Cardinal which it plainly did not.
While this suit differs from Del Costello in several ways, we must acknowledge that one of the rationales underlying Del Costellothe federal policy favoring quick resolution of labor disputesdoes argue for applying the short, six-month limitations period rather than the five-year period we apply below. But that was only one factor which motivated the court in Del Costello and cannot suffice by itself to demand adoption of the period of § 10(b). If this policy alone could carry the day, § 10(b) would apply to virtually all labor disputes, even breach of contract suits not analogous to suits under the NLRA. This result would conflict with Del Costello's admonition that borrowing from state law remains the norm, "in labor law or elsewhere." 461 U.S. at 171, 103 S.Ct. at 2281. Indeed, the "quick resolution" argument, if sufficient by itself, contradicts the result of Hoosier Cardinal, implying once again that Hoosier Cardinal had been implicitly overruled, even though Del Costello narrowed but reaffirmed the earlier case. And despite the pressure to use short limitations periods in any labor dispute, courts have not done so where the other rationales of Del Costello did not apply. In sum, while a six-month period might for some reasons be desirable, the continued viability of Hoosier Cardinal and the Supreme Court's limiting language in Del Costello require the Court to borrow the state statute of limitations most analogous to this case.

C.
Plaintiffs contend that either Illinois' five-year period for breach of oral contract, Ill.Rev.Stat. ch. 110, ¶ 13-205 (1985), or the ten-year period for breach of written contract, Ill.Rev.Stat. ch. 110, ¶ 13-206 (1985), applies to this suit. While at first glance, it would seem that the latter period controls since the collective bargaining agreement is written, Illinois courts have applied the five-year statute to suits under collective bargaining agreements. See Pratl v. Hawthorn-Mellody Farms Dairy, Inc., 53 Ill.App.3d 344, 347, 11 Ill. Dec. 216, 219, 368 N.E.2d 767, 770 (1st Dist.1977); Matzer v. Florsheim Shoe Co., 132 Ill.App.2d 470, 472-73, 270 N.E.2d 75 (1st Dist.1971). The courts follow common law doctrine saying that a contract is not "in writing" unless the parties to it, as well as its terms, can be learned from the document itself. If a party is not named in the contract, parol evidence must establish that the person is a party. Thus, since employees are not named in collective bargaining agreements, and parol evidence is needed to show that they are beneficiaries of it, Illinois law defines the contract as "oral" for purposes of applying a statute of limitations to a suit brought by the unnamed party. See Pratl, 53 Ill.App.3d at 347, 11 Ill.Dec. 216, 368 N.E.2d at 770. We therefore find that the five-year period is the most analogous Illinois period, since that is the one Illinois courts have applied in the rare cases where they have been called upon to resolve contract disputes *1037 involving collective bargaining agreements. Plaintiffs' suit is plainly timely under this statute.
In light of this analysis, we reject Jewel's argument that the ninety-day period found in the Uniform Arbitration Act, Ill.Rev. Stat. ch. 10, ¶ 112(b) (1985),[14] applies here, for the obvious reason that no arbitration occurred involving plaintiffs. Indeed, Jewel exhibits a bit of "chutzpah" in making this argument, since it refused to arbitrate in the first place. But even if its ultimate settlement with the Union could be squeezed into the definition of "arbitration," it was not one which plaintiffs were a party to. Jewel cites no case and offers no sound reason supporting its position that the limitations period for commercial arbitrations would apply to suits where no real arbitration took place and where the plaintiffs were not party to the quasi-arbitration which happened. In any event, even if the ninety-day period were to apply, to be faithful to Jewel's arbitration analogy the only sensible starting date for the period is the day of the "arbitration decision," which can only be the day the Union and Jewel settled. Since plaintiffs sued within ninety days of that settlement, the arbitration period would not bar this suit even if Jewel were right that it was somehow relevant.

IV.
Because the Union owed plaintiffs no continuing duty of fair representation after they left Jewel, we grant the Union's motion for summary judgment and dismiss Counts II and III. We also deny Jewel's motion to dismiss Count I to the extent it is based on the fair representation issue. That motion is also denied with respect to its limitations arguments. In light of our result, we deny as moot Jewel's motion for judgment on the pleadings on Counts II and III and plaintiffs' motion to strike that motion. It is so ordered.
NOTES
[1] That section reads:

(a) Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.
[2] Article IX of the Collective Bargaining Agreement contains the grievance and arbitration clauses the parties agreed to. Section 9.2 sets forth a three-step grievance procedure which appears largely informal. Section 9.3 allows either party to demand binding arbitration if the grievance procedure fails.
[3] On March 13, 1984, the NLRB's Regional Director dismissed the unfair labor practice charge. The Union appealed to the Board's General Counsel, who on September 7, 1984, sustained the appeal and instructed the Regional Director to issue a complaint. The Director did so, and a hearing was scheduled for June 24, 1985, before an Administrative Law Judge. Because of the parties' settlement, this hearing never took place.
[4] While this whole line of argument might appear circular, it is not. In the argument, we have assumed that the ex-employees have lost their right to vote on contracts, for union officers and so on. Such an assumption (which Jewel nowhere disputes) implies that the ex-employees are no longer Union members, which is exactly the conclusion we are seeking to determine. In other words, one might say it is circular to prove that there is no duty of fair representation by assuming that ex-employees are not Union members since that essentially assumes the conclusion. One might instead argue that plaintiffs did have the right to vote and participate in Union affairs, but no one knew it, and so they were unlawfully deprived of a chance to participate in the ratification of the contract.

But we have not improperly assumed our conclusion. As our discussion below of the Allied Chemical case makes clear, once they left these ex-employees could not properly remain part of the collective bargaining unit. Indeed, Jewel is not in fact claiming both that the Union owed a duty of fair representation to plaintiffs and that the plaintiffs were still Union members with a right to participate in Union affairs. Indeed, if Jewel were so arguing, there probably would have been a breach of the duty, since plaintiffs were not notified of or given a chance to vote on the June 1985 settlement. Instead, although Jewel does not say so, Jewel appears to be arguing implicitly that a residual duty of fair representation lingered as to ex-members of the Union, who had no corresponding right to participate in a settlement which left them high and dry. Jewel therefore appears to be arguing the plaintiffs were second-class Union members, bound to accept the consequences of the Union's exclusive representation but stripped of normal participatory rights accorded active employees. Jewel cannot have it both ways. If the duty existed, then plaintiffs were improperly denied the right to take part in the process of ratifying that settlement. If the plaintiffs were not Union members, then a direct rather than hybrid suit is warranted.
[5] The Union's brief in support of its motion for summary judgment, at 11, illustrates that plaintiffs would inevitably be sacrificed if they remained part of the unit and that the Union could not accommodate both factions:

Even if it may be said that some lingering duty of fair representation remains in the case of former employees, it must be obvious that the Union's paramount duty is to the working membership and not to those who terminated their employment. In all its actions the welfare of the current membership must be the Union's controlling consideration. In achieving for the current membership a new contract, the Union discharged its primary and paramount responsibility. Indeed, its responsibility to the current membership so greatly outweighs any responsibility it might have to former employees that the Union was under an affirmative duty to present the settlement proposal to the membership even if it did not favor the proposal. A breach of the duty of fair representation could very well have occurred if Local 881 had refused to present Jewel's proposal to the membership for its acceptance simply because the retroactive pay portion of the proposal did not apply to former employees.
[6] The Union argues repeatedly in its briefs that its obligations to active employees gave it no choice but to throw plaintiffs overboard. This happened despite the apparent fact that Union President Ron Powell told Union members that those who left the membership would be protected. But Union leaders testified in their depositions that when push came to shove current, not former employees, were their "primary concern," and that they "bargained away a claim of people who had left our membership in favor of what we thought was a better offer for people who were part of our membership." Deposition of Thomas Walsh at 63. It appears that the Union tried initially to get the back pay for plaintiffs, but "bargained them away" when Jewel took a hard line as to plaintiffs in the final stages of negotiation.
[7] A few other cases support this result as well. See Auto Workers v. Yard-Man, Inc., 716 F.2d 1476, 1484-85 (6th Cir.1983), cert. denied, 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984) (Union owes no duty to retirees and retirees may resolve disputes over vested benefits directly with employer); Anderson v. Alpha Portland Industries, Inc., 752 F.2d 1293, 1296-1300 (8th Cir.1985) (en banc) (retirees need not exhaust grievance or arbitration procedures for dispute over vested contractual benefits since they are outside of the collective bargaining relationship), cert. denied, ___ U.S. ___, 105 S.Ct. 2329, 85 L.Ed.2d 846 (1985).
[8] D'Amato involved the Union's duty to a probationary employee, who is not at all like a retiree or like plaintiffs. The Court noted that a minor conflict of interest arises whenever a union represents a discharged employee. Some more junior employee could theoretically oppose reinstatement because that would harm his or her relative seniority position. That conflict does not mean the union cannot practically discharge its duty to the discharged employee, nor does it excuse him or her from failing to exhaust grievance procedures. 760 F.2d at 1489. The serious and actual conflicts in this case dwarf the abstract and "nascent conflict" mentioned in D'Amato. Id.
[9] Thus, we need not decide what would happen if, say, Jewel picked on only one or a few employees, cutting their wages, and these employees left Jewel over time. There is no systemic conflict in such a case and no necessary trade off by current employees negotiating a new contract.
[10] True, the original agreement also envisioned a private grievance procedure. But Jewel refused to abide by that procedure, so it is disingenuous for Jewel to rely on it now. In any event, the original agreement did not call for the Union to represent former employees in their grievances.
[11] Del Costello involved two consolidated cases. We are giving just one of the fact patterns here.
[12] The Court considered and rejected the argument that the duty of fair representation suit against the Union is like one for legal malpractice. See 462 U.S. at 167-68, 103 S.Ct. at 2292.
[13] We reject Jewel's strenuous argument that this direct suit will undermine the settlement. Jewel offers no legal reason that the contract is not binding. We are not dismantling that agreement. Jewel's real complaint, once again, is that its expectations were undermined, that it signed a contract thinking it had gotten away with scuttling plaintiffs' claims. But plaintiffs were simply not represented then, and Jewel tried to capitalize on that. Jewel made a miscalculation that does not let it off the hook now. Jewel also suggests that our holding means current employees will get less when the next contract comes up, and that our result therefore interferes with the collective bargaining process. This theory (or threat perhaps) is speculation. Given the uncertainties of economics, we cannot say now that our result necessarily means current employees will get less in the next contract. That assumes a fixed economic pie. Jewel's theory also only poses an indirect effect on future "consensual processes." We do not think attenuated effects on the process were the kinds Del Costello contemplated.
[14] That Section reads:

(b) An application under this Section shall be made within 90 days after delivery of a copy of the award to the applicant, except that if predicated upon corruption, fraud or other undue means, it shall be made within 90 days after such grounds are known or should have been known.