**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

and

**Yul Brynner, Intervenor,**

v.

**ACTORS' EQUITY ASSOCIATION, Respondent.**

**No. 777, Docket 80–4074.**

United States Court of Appeals, Second Circuit.

Argued Feb. 5, 1981.

Decided March 17, 1981.

Mary K. O'Melveny, New York City (Sidney E. Cohn, Jerome B. Lurie, Jonathan W.

Lubell, Sandra B. Durant, Cohn, Glickstein, Lurie, Ostrin, Lubell & Lubell, New York City, of counsel), for respondent.

Christine Weiner, Atty., Washington, D. C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, John D. Burgoyne, Asst. Gen. Counsel, N. L. R. B., Washington, D. C., of counsel), for petitioner.

Paul M. Wolsk, New York City (Marshall, Morris, Powell, Silfen & Cinque, New York City, of counsel), for intervenor.

Before WATERMAN, MANSFIELD and KEARSE, Circuit Judges.

MANSFIELD, Circuit Judge:

The National Labor Relations Board (NLRB) and Intervenor, Yul Brynner, petition this court for enforcement of the Board's order dated February 19, 1980, requiring Actors' Equity Association (Equity), a theater actors' union, to cease violating §§ 8(b)(1)(A) and 8(b)(2) of the National Labor Relations Act, 29 U.S.C. § 158(b)(1)(A) and (b)(2) (NLRA), by charging non-uniform dues that unjustifiably discriminate against aliens who belong to the union and are in this country temporarily to perform in stage productions. The order also mandates repayment of all past overcharges from April 6, 1976, to the present. We agree with the NLRB's finding that the assessment of non-uniform dues against aliens without any reasonable basis violates the Act, and find no fault in the Board's choice of remedy. We also agree that intervenor Brynner was an employee subject to the Act's protection rather than a supervisor, and that this suit is not time-barred under § 10(b) of the Act, 29 U.S.C. § 160(b). Accordingly, we grant the Board's petition for enforcement.

Actors' Equity is an employees' association that has entered into collective bargaining agreements on behalf of stage actors with various theater organizations in New York and throughout the United States and Canada. Its bargaining agreements universally contain a "union security clause" providing that the employer will hire only union members to act in its productions.

Equity has for many years attempted to regulate participation by foreign actors in American theater performances. This regulation has taken several forms. First, since 1964 Equity has participated in an agreement with the United States Department of Labor and the Immigration and Naturalization Service to the effect that the Labor Department would seek Equity's advice on aliens' applications for visas under 8 U.S.C. § 1101(a)(15)(H), which permits resident aliens to obtain jobs in the United States only if they are rendering exceptional or temporary service in jobs which no unemployed Americans are capable of performing. Second, Equity has agreed with New York theater employers' organization—the Council of Stock Theatres (COST), League of Resident Theatres (LORT), and the League of New York Theatres and Producers (Producers)—that members of those organizations (the primary employers of aliens in the United States) will not hire non-resident aliens without Equity's consent.[1]

Finally, Equity has imposed a separate dues schedule on non-resident aliens. Citizens of the United States and Canada who belong to Actors Equity, as well as aliens who reside here with the intention of making this country their permanent residence, pay dues according to a sliding scale ranging from $42 per year for an actor earning no more than $2,500 per year to a maximum of $400 for an actor earning more than $30,000 per year. Once a so-called "resident member" makes more than $1,400 per year his dues will never exceed 3% of gross in-

---

1. Equity's agreements with COST and LORT wholly prohibit employment of non-resident aliens without Equity's prior consent. Its agreement with Producers provides that a producer may not apply to the Immigration and Naturalization Service for admission of an alien actor unless Equity and Producers both approve the application, and that differences of opinion between Equity and Producers will be resolved by arbitration.

come, with a $400 per year limit. Non-resident aliens who are allowed to perform in the United States, on the other hand, must pay 5% of their stage income as dues, with no ceiling. Yul Brynner, the Intervenor, is a Swiss citizen and resident of France who was admitted into the United States to play the King of Siam in *The King and I*, a revival of a play in which he starred some years ago. If he had been a U.S. citizen or resident, his dues to Actor's Equity for the first year of the play's run would have been $400; under the separate schedule for non-resident aliens, he was required to pay $45,-000.

Charges were filed with the Board on October 8, 1976, alleging that the union was violating §§ 8(b)(1)(A) and 8(b)(2) of the Act through employment of its discriminatory dues schedule. Noting that those provisions prohibit discrimination against employees except as provided by § 8(a)(3), which allows unions and employers to enter union security agreements, the charging party relied on the second proviso to § 8(a)(3), which states that employees who belong to a union having in effect a union security agreement may be required as a condition of membership only to "tender the periodic dues and the initiation fees *uniformly required* as a condition of acquiring or retaining membership." (Emphasis supplied).

The administrative law judge, and later the Board, agreed that the separate dues structure unlawfully discriminated against aliens by violating the union's duty to charge uniform dues or to demonstrate a reasonable justification for the non-uniformity. While it declined to impose a *per se* rule that any discrimination in dues charged to aliens was unacceptable under the Act, it nevertheless found such discrimination presumptively invalid, and declared that absent some justification for the non-uniformity it must be found illegal. It then rejected the justifications claimed by Equity—that the higher dues structure was necessary (1) to limit the number of alien actors in the United States, (2) to prevent reprisals from British Equity, Britain's "friendly adversary" correlative of Actors' Equity, and (3) to counterbalance British Equity's power to exclude as many American actors as it wants simply by telling the British Labor Board whom it wants excluded. Finding no merit in Equity's claim that the suit was time-barred, the Administrative Law Judge ordered Equity to desist from imposing a discriminatory dues schedule and ordered repayment of all amounts collected after April 6, 1976 (six months before the complaint was filed in this case) in excess of what non-resident aliens would have paid if treated like residents or citizens.

## DISCUSSION

Equity first contends that the Board has no jurisdiction over the rights of aliens because the NLRA is aimed at protecting American workers only and that non-resident aliens therefore have no cognizable rights under the Act. We disagree. Nothing in the terms or construction of the NLRA limits the meaning of the word "employees" to American citizens or permanent residents. The provisions in question here do not specify "American-citizen" employees as opposed to non-resident aliens. They merely proscribe discriminatory treatment of individuals or groups of employees who belong to unions, without regard to the employees' nationality or residence. For instance, Equity does not deny that Canadian citizens and resident aliens have rights as union members under the NLRA. It would be unthinkable to allow Equity to demand union membership and payment of dues by alien members performing in the United States while denying them rights associated with union membership.[2]

---

**2.** Although non-resident aliens who belong to Equity are also not allowed to vote or become union officials, the Board has made no effort here to attack these restrictions as violative of the union's duty of fair representation. Whether a union may impose such restrictions on employee rights remains a matter of dispute. Compare *NLRB v. Miranda Fuel Co.*, 326 F.2d 172 (2d Cir. 1963), and *NLRB v. Local 485, IUE*, 454 F.2d 17, 21 n.6 (2d Cir. 1972), with *Vaca v. Sipes*, 386 U.S. 171, 177–78, 182, 87 S.Ct. 903, 909–910, 912, 17 L.Ed.2d 842 (1967), and *Local*

■ Having recognized that aliens possess equal rights as union members, we have no difficulty concluding that the union's two-tiered dues structure discriminates against non-residents by failing to impose uniform ·dues without some legitimate basis for the discrimination. See *NLRB v. Kaiser Steel Corp.*, 506 F.2d 1057 (9th Cir. 1974); *NLRB v. Electric Auto-Lite Co.*, 92 N.L.R.B. 1073 (1950), *enf'd*, 196 F.2d 500 (6th Cir. 1952). Equity attempts to justify its dues discrimination on three grounds. First, it argues that the 5% dues rate protects employment opportunities for members by limiting alien membership in American productions. Second, it suggests that the rule protects Americans from hostile or retaliatory actions on the part of British Equity, which now reciprocally charges American theater actors 5% dues.[3] Third, and relatedly, it says that the rule (or at least the power to have the rule) provides a needed counterweight to British Equity's influence over alien admissions in England.

We find no merit in these asserted justifications. There is no substantial evidence that the 5% dues assessment, either because of parity between American and foreign pay scales or for some other reason, would inhibit foreign actors from participating in America's comparatively lucrative theater productions. On the contrary, past statements by Equity indicate that the 5% dues rate was adopted primarily as a revenue-producing measure. Moreover, Equity's power to exclude aliens derives from an entirely different source, its agreements with COST, LORT, and Producers. In the face of these agreements, which give Equity effective authority to decide which aliens to admit and which to exclude, the 5% dues rate has no significant exclusionary force.

Similarly, the asserted justification that the higher dues are necessary to protect American actors from retaliatory action on the part of British Equity, which imposes a reciprocal 5% dues rate, lacks rationality. The fairness of discriminatory acts under American labor law does not depend on what is practiced under British labor law. The 5% American dues levy seems more likely to provoke hostility than to eliminate it. Nor has it had much influence upon British Equity's decision-making, since it has been in existence for about 50 years and British Equity's retaliatory 5% dues rate has existed almost that long.[4] Finally, on a narrower level, concerns about British Equity could hardly be relevant as a justification for charging higher dues to Brynner, who is a Swiss citizen and French resident and has never been either a citizen or a resident of Great Britain.

■ Equity next protests that this action is time-barred under § 10(b) of the Act,[5] since the present policy of charging differential dues is traceable to events that took place many years ago, long before commencement of the six-month period prior to

12, *Rubber Workers v. NLRB*, 368 F.2d 12, 17 (5th Cir. 1966), *cert. denied*, 389 U.S. 837, 88 S.Ct. 53, 19 L.Ed.2d 99 (1967). Instead, the Board limits its attack to Equity's alleged discriminatory failure to impose the uniform dues specifically required by the second proviso to § 8(a)(3). Nor does our opinion bear on the union's power to limit the number of aliens who perform on American stages by impeding their entry into the United States or into the union.

3. Though British Equity serves both theatrical and film actors, unlike American Equity it does not impose differential dues on American movie actors, just as no American union imposes higher dues on British film actors.

4. Equity places much emphasis on the statement by British Equity's General Secretary that British Equity would not necessarily feel bound

to eliminate its 5% dues rate if the Board's enforcement petition is granted. Even assuming that British Equity would impose a non-reciprocal dues assessment on Americans after this case, this argument merely proves that British Equity acts independently of American Equity, shedding doubt on Equity's protests that its dues rates somehow affect British Equity's rates.

5. Section 10(b), 29 U.S.C. § 160(b), provides in relevant part as follows:

"[N]o complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made...."

the filing of charges against Equity with the Board, citing *NLRB v. Auto Warehousers, Inc.*, 571 F.2d 860 (5th Cir. 1978). According to its reading of § 10(b) and *Auto Warehousers*, no action may be brought to protest an unfair labor practice more than six months after the first time the unfair labor practice took place, regardless of how many times the practice has been repeated or what present repercussions the past practice causes. We firmly rejected such a reading of § 10(b) in *NLRB v. Local 443, International Bhd. of Teamsters*, 600 F.2d 411 (2d Cir. 1979), stating:

"To the extent that ... *Auto Warehousers, Inc.* ... may be read to suggest that the maintenance of a super-seniority provision unsupported by a present adequate business justification does not constitute a violation of the Act, we decline to follow the reasoning of that case." *Id.* at 413 n.4.

Here the discriminatory non-uniformity in dues charges is unsupported by any presently existing adequate business justification. Indeed, the need to look into the past arises only when Equity attempts to gloss its present practices with a historical justification. Equity's reading of § 10(b) would mean that no union member could challenge the validity of an existing disparate dues schedule where the practice had existed for more than six months prior to the filing of charges. We decline to adopt such a preclusive rule.

The union's remaining claims are equally meritless. Equity claimed before the Board that Brynner has no rights under the Act because he was a supervisor and not an employee according to the reasoning of *NLRB v. Yeshiva University*, 444 U.S. 672, 100 S.Ct. 856 (1980), after abandoning this argument before the administrative law judge. Apart from Equity's waiver of the right to make this argument here by abandoning it below, there is nothing in Brynner's contract with The King of Siam Company that gives him the authority or the trappings of a supervisor rather than an employee.

We also find no impropriety in the remedy imposed by the Board. Though the members of the class of aliens entitled to recover under the Board's order have not all been named, the class has been fully defined as those non-resident alien employees who paid more in dues than they would have paid as residents or citizens from April 6, 1976, to the present. No more is required for the Board to order classwide relief where, as here, at least one non-resident member of Equity incontestably paid higher dues than a citizen would have paid after April 6, 1976. Nor do we find the relief ordered punitive, as claimed by Equity, which relied on *Local 60, United Carpenters v. NLRB, supra.* This order does not require the repayment of all union dues paid under the invalid rule, as the Board's order in that case did. Rather, the wronged employees are being allowed to recover only the difference between what they paid and what they would have paid as American citizens. This reimbursement is clearly remedial and not punitive.

Order enforced.