792 F.2d 570
 122 L.R.R.M. (BNA) 3316, 104 Lab.Cas. P 11,970
 Ronald SEVAKO; Charles Fenton; Thomas Porter; Thomas
Hewlett; John Cicero; Steve Stacey; Robert Mohammed;
Raymond Housel; Andrew D. Shuluga; Terrance LaTessa;
James Raphtis; Stewart Slider and Francis Harnar,
Plaintiffs- Appellants,
v.
ANCHOR MOTOR FREIGHT, INC.; International Brotherhood of
Teamsters, Chauffeurs, Warehousemen and Helpers of
America, Local 377; and Local 377;
Robert Elser, Defendants-Appellees.
 No. 84-3618.
 United States Court of Appeals,
Sixth Circuit.
 Argued Feb. 25, 1986.
Decided June 5, 1986.
As Amended on Denial of Rehearings and Rehearings En Banc
Aug. 22, 1986.
 
 James E. Melle, argued, Lucas, Prendergast, Albright, Gibson & Newman, Columbus, Ohio, Robert J. Walter, for plaintiffs-appellants.
 David R. Knowles, argued, William W. Allport, Cleveland, Ohio, Audrey P. Forrest, Anthony P. Sgambati, II, Green, Schiavoni, Murphy, Haines & Sgambati, Youngstown, Ohio, Barry Laine argued, Sorrell Logothetis, argued, David Kosanovich, Logothetis & Pence, Dayton, Ohio, for defendants-appellees.
 Before JONES and WELLFORD, Circuit Judges; and GILMORE*, District Judge.
 WELLFORD, Circuit Judge.
 
 
 1
 Appellants, thirteen employees of appellee, Anchor Motor Freight, Inc. ("Company"), appeal entry of summary judgment by the district court. The employees had filed hybrid Sec. 301/unfair representation claims under the National Labor Relations Act against the Company and the local and international Unions. In dismissing the action, the district judge concluded that the claims of appellants, who were hired by the Company between 1971 and 1973, were time barred.
 
 
 2
 The Company owns a terminal in Lordstown, Ohio where GM manufactured cars are stored until delivered to dealers. During their period of employment with the Company, appellants generally held yard positions, involving work on the grounds of the Lordstown terminal and responsibility for preparing cars for shipment. Each year the Company fills approximately 20 to 40 yard positions at this terminal. In addition to the yard position, the terminal offers a "driver" job position. Drivers haul automobiles via tractor trailers from the grounds of the terminal yard to east coast dealerships. Approximately 500 drivers work out of the Lordstown facility. Both yard and driver positions at the Company's Lordstown terminal are governed by the terms of a master collective bargaining agreement between Local 377 and the Company and a supplemental agreement known as the "Local Rider, Central and Southern Conference Area Supplemental Agreement."
 
 
 3
 Since September 1, 1973, a written portion of the supplemental agreement entitled "Availability of Yard Openings" provides that drivers may bid upon yard jobs in accordance with their seniority. Excepted from bid are yard jobs occupied by yard men employed prior to March 5, 1969. Only yard positions occupied by yard men employed prior to March 5, 1969 are given priority for yard jobs. Employees, either yard men or drivers, with the greatest seniority are awarded available yard positions provided that the employees meet Department of Transportation qualifications.
 
 
 4
 In January 1973, the Company, allegedly acting "in concert" with the local Union, conducted the first "annual bid" in which drivers were able to obtain, with full seniority, a yard position. Drivers with greater seniority were thereby able to bid successfully and receive a yard position, reducing the number of positions available to the regular yard men. During the next decade, this bid procedure occurred annually, resulting in lay off of the regular yard men.
 
 
 5
 Appellants, yard men, filed numerous grievances between 1974 and 1982 attacking this annual bid procedure, asserting that the master agreement, subsequent riders, and proper interpretations of those documents do not permit persons formerly occupying driver positions to bid upon and receive yard positions at the annual bid in preference to yard men who occupied these positions. Appellants contend that the agreement requires that they be given preference over drivers in the bidding of already existing yard jobs, even though appellants may have less seniority than the drivers who successfully bid the jobs. Appellants also claim that their grievances on this issue have never been properly handled by the union nor given a fair hearing.
 
 
 6
 No grievance was filed within six months after the "annual bid" practice began in 1973. Grievances were, however, filed by various appellants in 1974, 1975, 1979, 1980, and 1982.
 
 
 7
 1. 1974 and 1975: Porter/Housel grievances I
 
 
 8
 Appellants Porter and Housel filed with the local Union several grievances about the propriety of the annual bid process. These grievances were not processed, and the Local's business agent allegedly told appellants that their grievances were not valid.
 
 2. 1979:[1] Porter/Housel grievance II
 
 9
 After the 1979 annual bid, Porter and Housel again filed a grievance challenging the bidding process. It was also asserted that in 1978 the Company began overbidding yard positions, preventing recall of regular yard men in favor of drivers. The 1979 grievance proceeded to arbitration, and the Joint Arbitration Committee denied the grievance in its entirety on December 14, 1979. The Committee determined: "Based on the facts presented, the protest[s] of Housel and Porter are denied."
 
 3. 1980: Shuluga grievance
 
 10
 Most regular yard men were laid off in 1980 when the annual bid was conducted. After the 1980 bid, a group grievance about the bid was filed at the local level and ultimately presented for resolution to the Automobile Transporters Ohio Joint Arbitration Committee. On December 4, 1980, the Arbitration Committee denied the grievance and ruled:
 
 
 11
 Based on the facts presented which indicated that the "Annual Bid" complained about has been in effect for eight (8) years. The only method open to the Company and Local Union to change that condition is by mutual agreement with the approval of the majority of employees.
 
 4. 1982: Fenton and Sevako grievances
 
 12
 On October 5, 1982, appellant Fenton filed a group grievance, again objecting to the layoff of appellants following the annual bid in September 1982. Also in October 1982, appellant Sevako filed a group grievance on the same matter, wherein it was admitted that the annual bid issue "had been raised in the past," but had never been properly resolved.
 
 
 13
 In November 1982, the Joint Arbitration Committee disposed of the Fenton grievance and again stated:
 
 
 14
 The prior decision of this Committee ... is affirmed.
 
 
 15
 Based on the facts presented which indicated that the annual bid complained about has been in effect for eight (8) years, the only method open to the Company and the Local Union to change that condition is by mutual agreement with the approval of the majority of the employees.
 
 
 16
 On March 4, 1983, the Joint Arbitration Committee, while considering the Sevako grievance, was apprised that the identical matter had been presented in previous arbitrations. Thereafter, in its decision, the Arbitration Committee rejected the Sevako grievance and merely reaffirmed the Shuluga 1980 decision, stating:
 
 
 17
 When this case was called, the Company took the position that an identical case was heard by this Committee (Case No. 1265) [Fenton grievance] and as a matter of fact a similar case was heard in 1980 (Case No. 846) [Shuluga grievance]. The Company as well as the members of the Committee explained the application of "seniority transferability" as it applies to the employees with a common seniority board.
 
 
 18
 DECISION: The prior decision of this Committee ... is affirmed.
 
 
 19
 Based on the facts presented which indicated, that the annual bid complained about has been in effect for eight years, the only method open to the Company and the Local Union to change that condition is by mutual agreement with the approval of the majority of the employees.
 
 
 20
 On June 6, 1983, appellants filed suit in district court.[2] On June 29, 1984, the district court granted defendants-appellees' motions for summary judgment on the ground that appellants' action was not timely filed because it concluded that appellants' cause of action accrued in 1974 and that no claim had been timely filed within six months after the 1974 accrual date. Appellants appeal that determination.
 
 
 21
 As the district judge observed, the real issue in this case is "when [did] Plaintiffs' cause of action accrue[] for purposes of applying the statute of limitations." In hybrid Sec. 301 actions, the six-month limitations period of Sec. 10(b) of the National Labor Relations Act, 29 U.S.C. Sec. 160(b), applies. DelCostello v. International Brotherhood of Teamsters, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983); see also Smith v. General Motors Corp., 747 F.2d 372 (6th Cir.1984) (en banc) (applying DelCostello retroactively). Since this suit was filed on June 6, 1983, appellants' cause of action must have accrued by January 8, 1983 six months before filing, unless some tolling principle otherwise precluded accrual of the cause of action.
 
 
 22
 Appellants argue that the Union and the Company committed a continuing course of improper action in respect to the annual bid procedures. Appellants also claim that the Union's repeated failures to process their grievances comprised continuing wrongdoing. Each refusal to process a grievance, in effect, was claimed to be equivalent to accrual of a separate cause of action. Appellees, on the other hand, urge rejection of the continuing activities theory and contend that appellants' cause of action accrued in 1973-74 when the first annual bid was held and when the Union first refused to process a grievance challenging the merits of an annual bid.
 
 
 23
 In determining the date of accrual in hybrid Sec. 301 actions, we have held that "a claim accrues under section 10(b) when the claimant discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged violation." Adkins v. International Union of Electrical, Radio & Machine Workers, AFL-CIO, 769 F.2d 330, 335 (6th Cir.1985); see also Shapiro v. Cook United, Inc., 762 F.2d 49, 51 (6th Cir.1985).
 
 
 24
 Relying upon a doctrine formulated primarily in the context of Title VII and civil rights cases, appellants contend that the annual bid process carried out in alleged contravention of bargaining agreements constituted continuing violations such that a cause of action arose at each annual bid from 1973 to the 1982 bid. Appellees respond that the continuing violation analysis is inapplicable to Sec. 301 actions, citing numerous decisions rejecting a continuing violation rationale as a basis for finding accrual of separate actions arising from one policy. See, e.g., Metz v. Tootsie Roll Industries, Inc., 715 F.2d 299 (7th Cir.1983), cert. denied, 464 U.S. 1070, 104 S.Ct. 976, 79 L.Ed.2d 214 (1984); Former Frigidaire Employees Association v. International Union of Electrical, Radio and Machine Workers, Local 801, 573 F.Supp. 59 (S.D.Ohio 1983), affirmed sub nom. Adkins v. General Motors Corp., 769 F.2d 330 (6th Cir.1985); Adkins v. General Motors Corp., 573 F.Supp. 1188 (S.D.Ohio 1983), affirmed in part, reversed in part, 769 F.2d 330 (6th Cir.1985). The alleged continuing violation in those cases involved a union's adoption of policy that impacted upon plaintiffs on one occasion, and the Union's failure to make an affirmative change to correct the situation. This case involves alleged repeated violations each year by the Union and Company that repeatedly injured appellants each time drivers bid and received yard jobs. The nature of the alleged misconduct in this case involves an active annual bid procedure and course of conduct not a mere passive refusal to respond to a single action by the employer.
 
 
 25
 The repeated nature of the alleged violations in this case is similar to those cases where a union repeatedly charged certain union members excessive dues or where an employer paid certain groups of employees wages less than that required by the collective bargaining agreement. In NLRB v. Actors' Equity Association, 644 F.2d 939 (2d Cir.1981), Yul Brynner challenged the union's longtime practice of charging unjustifiably discriminatory dues to alien members. Even though the union's practice had existed for years, the Second Circuit did not find the suit to be time barred because no present adequate business justification supported such a clearly discriminatory practice, and the court refused to formulate a preclusive rule forbidding anyone from challenging the practice.
 
 
 26
 Similarly in Angulo v. Levy Co., 568 F.Supp. 1209 (N.D.Ill.1983), affirmed sub nom. Flores v. Levy Co., 757 F.2d 806 (7th Cir.1985), the district court recognized a continuing violation theory to hold timely employees' cause of action for alleged breaches occurring six months prior to the filing of the lawsuit. In Angulo the union had been paying Hispanic workers for the last decade a lower pay rate than mandated by the collective bargaining agreement. The court in Angulo rejected the union's defense that the claims were time barred and agreed that plaintiffs' allegations of a continuing course of discriminatory treatment was sufficient to find that the limitations period runs from the occurrence of each violation, not from the first time the discrimination took place. Id. at 1213. The Angulo court did not, however, find that all alleged violations within the ten year period were actionable. Rather, only those allegations of misconduct by defendants that had occurred within six months prior to the date on which the lawsuit had been filed were timely. Id. at 1213-14. Cf. Lewis v. Local Union No. 100 of the Laborers' International Union, 750 F.2d 1368 (7th Cir.1984) (tolling the statute of limitations because of a continuing violation, but permitting recovery only if some improper conduct occurred within the six months prior to suit).
 
 
 27
 We agree with the rationale in these cases and hold that where the conduct challenged by employees/union members involves a continuing and allegedly improper practice that causes separate and recurring injuries to plaintiffs, the action is deemed to be "in the nature of a continuing trespass." Angulo, 568 F.Supp. at 1213, quoting Marlowe v. Fisher Body, 489 F.2d 1057, 1063 (6th Cir.1973). A separate cause of action accrued, therefore, each time defendants implemented the annual bid procedure.[3] Only those asserted improper acts occurring six months prior to the institution of suit in federal district court, however, are actionable. On remand, the district court should determine whether any of the alleged violations occurred six months prior to the filing of the complaint on June 6, 1983. If the court concludes that any separate and individual cause of action asserted by the appellant accrued prior to the six months limitations period, the action should then be dismissed as time barred.
 
 
 28
 Appellants contend, however, that some principle of tolling, primarily fraudulent concealment of documents[4] favorable to their interpretation of the agreement, should permit them to recover for injuries resulting from the first annual bid in 1973 and thereafter. Although fraudulent concealment may, under proven facts, be sufficient to toll the running of the statute of limitations, appellants offered insufficient evidence to show intent to conceal. Appellants did not show anything more than that the Union did not on its own volition give appellants these materials without any request. As in Shapiro v. Cook United, Inc., appellants have not shown
 
 
 29
 that the defendants fraudulently concealed any facts respecting the accrual or merits of his claims. In order to prove fraudulent concealment, the plaintiff must show that he failed to discover facts that serve as the basis of his cause of action despite due diligence on his part to discover the facts, and that the concealment was fraudulently committed by the party or parties sought to be held responsible by the plaintiff.
 
 
 30
 762 F.2d 49 at 51. Assuming, arguendo, that appellants had sufficiently established a claim of fraudulent concealment, any benefit from the tolling of the limitations period was lost because suit was not filed within six months after the existence of the documents was discovered in 1980.
 
 
 31
 Appellants raise two other arguments in support of their argument that the action was timely. First, appellants suggest that the appellees' failure to raise the timeliness issue in prior grievances amounts to a waiver of that issue. Appellants are incorrect because the Fenton and Sevako grievances were disposed of by the Committee on the basis that those cases had been heard before. Thus, the appellees relied upon a res judicata analysis before the Arbitration Committee.[5] Although timeliness was never specifically raised, under the circumstances, appellees are not precluded from presenting this defense. Appellants contend also that the statute of limitations should not run because the appellees allegedly committed three other unfair labor practices after the complaint was filed. Relying upon Local Lodge No. 1424, International Association of Machinists v. N.L.R.B., 362 U.S. 411, 80 S.Ct. 822, 4 L.Ed.2d 832 (1960), (Bryan Manufacturing ), the appellants claim that "if the anterior events are not barred [as evidence], then the cause of action did not accrue to prevent litigation of the entire history of this controversy." This is an attempt to bootstrap by concluding that if evidence of other unfair labor practices can be admitted to show the nature of the alleged wrongdoing, those same acts subsequent to the filing of the complaint prevent the action from accruing at all. We cannot accept such reasoning.
 
 
 32
 The district court ruled that the claims of appellants were barred by the statute of limitations, because the drivers were allowed to transfer beginning in 1973 over the appellants' objections, and because Shuluga's grievance, based on the claimed invalidity of such bid procedure and transfer, was denied in 1980. We have decided that each time the alleged wrongful bid procedure is implemented, a new claimed violation of the collective bargaining agreement may occur. We are prepared to remand this case to the district court to determine whether any alleged violation occurred within six months prior to the filing of the complaint. Our holding does not preclude defendants-appellees from asserting res adjudicata, collateral estoppel, or any other affirmative defense[6] that may rely upon a prior ruling, judgment or record which determines or decides the issue raised by appellants. We have held only that a claim based on an asserted continuing violation is not barred merely because it may also have occurred before the time bar.
 
 
 33
 Accordingly, we REVERSE and REMAND the action to the district court for a determination as to whether any alleged violation occurred six months prior to the filing of the complaint on June 6, 1983. On remand, the district court should also decide whether the International is a proper party to the suit.
 
 
 
 *
 Honorable Horace W. Gilmore, United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 Appellants assert that after the 1978 bid, Porter and Housel tried to file another grievance about the bid, but the business agent discarded it
 
 
 [2]
 Appellants seek a broad range of relief:
 A. That they be reinstated to their positions at Defendant Company and that such reinstatement be retroactive to the first date of wrongful layoff without any break in seniority;
 B. That this Court determine that Plaintiffs were wrongfully laid off by Defendant Company without just cause, in breach and violation of Plaintiffs' rights under the contract documents, and that Defendant Local 377 and its Business Agent breached their duty of fair representation owing to Plaintiffs and that Defendant International Union breached its duty to Plaintiffs by failing to protect the interests and rights of its minority members and is also responsible for the actions of its affiliate Local 377;
 C. That this Court award Plaintiffs back pay in the present total sum of approximately $4,000,000 plus back pay as it accrues from and after this date against all Defendants and in such proportion between them as this Court may determine to be just and proper and all other damages suffered by Plaintiffs in the amount of $1,000,000;
 D. That this Court declare null and void all prior rulings of the joint arbitration committee;
 E. That an order issue from this Court restraining and enjoining the annual bid to be conducted in August, 1983, and all future annual bids; and
 F. That this Court grant Plaintiffs such other and further relief as may be just and proper and award Plaintiffs their costs expended herein.
 Joint Appendix 18-19.
 In essence, appellants seek damages relating back to 1973, a decade before this suit was instituted.
 
 
 [3]
 Included in the implementation concept are the annual bid itself, the union's refusal to process grievances relating to the annual bid, as well as any actions taken by the company to execute the bidding results and execute lay-offs of plaintiffs
 
 
 [4]
 The first document allegedly concealed is a 1974 decision from the Central-Southern Conference Automobile Transporters Rider Arbitration Committee, the arbitration panel empowered to issue final and binding decisions on grievances filed by Company employees. This is a decision on a 1973 grievance filed by Company drivers relating to the freezing of the pre-1969 yard employee positions in the Rider and General Driver Bumping Rights. Appellants claim that this 1974 Rider Committee (Bumping) Decision has some bearing on the validity of the bid procedure. Appellants claim that they did not learn of this decision until the filing of the Shuluga group grievance by appellant Shuluga in 1980
 The second item that appellants claim was concealed from them is a seniority transferability interpretation established as part of the national master agreement in 1977, which is identified as Bulletin No. 371. This interpretation Bulletin deals with the procedures for filling vacancies created by discharges, voluntary quits, deaths, retirements or needs, and provided that when the Company and Union were unable to agree on interpretation of the agreement, laid off employees must be given full recall rights before other employees had a right to transfer. Appellants acknowledge that in a grievance filed in 1979, appellants Housel and Porter objected to the annual bid and specifically claimed that it violated Bulletin 371. Thereafter, the Housel and Porter 1979 grievance proceeded to arbitration where on December 14, 1979, the Joint Arbitration Committee denied the grievance in its entirety.
 
 
 [5]
 Ordinarily a decision by an arbitrator acts as the final word on the matter. However, where, as here, appellants challenge that the union improperly refused to assist appellants in presenting their case before the arbitration panels, the finality of an arbitral decision is questionable. See, e.g., Hines v. Anchor Motor Freight, Inc., 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976); Spielmann v. Anchor Motor Freight, Inc., 551 F.Supp. 817 (S.D.N.Y.1982)
 
 
 [6]
 The appellee union, for example, in its answer raised a "fifth defense" to the effect that plaintiffs' grievances were finally processed and resolved and that plaintiffs were bound thereby